**UNITED STATES of America, Appellee,**

v.

**Lilly SCHMIDT, Defendant–Appellant.**

**No. 1522, Docket 95–1117.**

United States Court of Appeals,
Second Circuit.

Argued May 9, 1996.

Decided Jan. 17, 1997.

Michael Young, New York City, for Appellant.

Ira M. Feinberg, Assistant United States Attorney, New York City (Mary Jo White, United States Attorney, Mei Lin Kwan–Gett, Robin E. Abrams, Assistant United States Attorneys, S.D.N.Y., New York City, of counsel), for Appellee.

Before: CARDAMONE, ALTIMARI, and PARKER, Circuit Judges.

CARDAMONE, Circuit Judge:

Lilly Schmidt (defendant or appellant) appeals from a judgment of conviction entered on February 21, 1995 by the United States District Court for the Southern District of New York before Judge Kimba M. Wood, after a jury trial. Schmidt, who at the time of the commission of the crime was confined in a state prison's mental unit, stands convicted of a plan to murder two federal agents, solicitation to commit that crime, and attempted escape from custody, for which she received a sentence of 30 years. The issue facing the district court was whether these criminal plans were the rantings of a person suffering from a mental disease or defect, or a well-planned scheme warranting a government sting operation that led to appellant's arrest, trial and conviction.

What the truth is regarding defendant's mental condition—a subject of this appeal—is a matter about which it is difficult to know anything for certain, for the truth on such a subject quite often lies deeply hidden. The issue was made even more puzzling when the government, which had insisted throughout Schmidt's trial that she was not incompetent, as she claimed, but merely malingering, changed position. In a later proceeding held in Texas, it alleged that Schmidt suffers from a serious mental disease.

A court decides an issue of mental competency by conducting hearings at which it entertains expert testimony from psychiatrists who have examined the defendant. That was done most thoroughly at every stage of this case by an experienced trial judge. While the "truth" regarding appellant's mental state at the time of the events for which she stands convicted may not ever be definitely known, we are satisfied that the proceedings conducted in the district court accorded her all the legal rights to which she was entitled, and the result reached should be affirmed.

## BACKGROUND

### A. *Plot To Escape*

While Schmidt was in the custody of the New York City Department of Corrections at Rikers Island in January 1992, awaiting trial on state fraud charges, her boyfriend used a counterfeit check to obtain her release. Using more counterfeit checks, the couple went on a spending spree for luxury goods, buying jewelry, paintings, and foreign currency.

This criminal escapade ended on February 25 when appellant was arrested and later indicted on federal charges of conspiracy, bank fraud, and other crimes. Because of the pending state charges, she was returned to Rikers Island. Two special agents of the

Department of Defense Criminal Investigative Service, Kenneth Siegler and Kenneth Connaughton, transported defendant back and forth to federal court for her appearances before United States District Court Judge John E. Sprizzo. At this time, Schmidt was, at her own request, in the mental observation unit at Rikers Island.

In May 1992 she began to plan a daring escape from custody. First, she contacted Annabelle Colon, another Rikers Island inmate, and asked her to hire two men to help her escape by killing the special agents while they transported her to federal court. When Colon acknowledged she had friends who could do this, Schmidt gave her detailed written and oral plans, and offered to pay Colon's friends $20,000 for their efforts. Upon Colon's later refusal to help, Schmidt turned to Nancy Vitello and Monica Odem, two other Rikers Island inmates. Schmidt gave them a letter with specific details regarding her escape plan and how she was to abscond from the country. The details included a physical description of the agents, their automobile, the route they travelled from Rikers Island to federal court, and the kinds of weapons they carried. Schmidt recommended three locations for the crimes to be committed, including a store where the agents usually bought her sodas she requested. Defendant promised to pay the hit men $100,000 each and Vitello and Odem $50,000 each.

Vitello called Inspector John Cuff of the United States Marshals Service on June 8 and told him of Schmidt's plan to murder the two agents. He met Vitello three days later and she handed him Schmidt's written instructions. After consulting with the United States Attorney's Office the Inspector decided to conduct an undercover investigation. He told Vitello that he would impersonate a hit man named "Mike" who was willing to carry out the crime.

After Vitello told Schmidt about "Mike," Inspector Cuff (posing as "Mike") received 15 phone calls from Schmidt between June 16 and June 23, 1992. Defendant gave the inspector instructions for the murders and her escape. She explained that the hit men would receive $100,000 each and that Vitello and Odem would receive $50,000 each, and

that $100,000 would be given to the hit men to set aside as Schmidt's flight money. Patricia Scott, a friend of Schmidt's, would hold the money and deliver it to the hit men at a safe house. Inspector Cuff spoke to Scott twice and she told him she was holding a suitcase of Schmidt's that contained $500,000 in cash. The Inspector's phone conversations with Schmidt and Scott were tape-recorded and these recordings were later admitted into evidence at trial.

As per Schmidt's instructions, the murder of the agents and breakout were set for June 24, a day scheduled for Schmidt to appear in federal court. Two deputy United States Marshals posing as hit men and impersonating Special Agents Connaughton and Siegler—whom they had ostensibly murdered and whose weapons and identification they now had—picked up Schmidt at Rikers Island, handcuffed her, told her that they were the hit men she hired, and spirited her out of the Rikers Island facility. They went to the designated "safe house" where Schmidt showed excitement about her escape, but no remorse over the agents' purported deaths. She was arrested there.

A grand jury in the United States District Court for the Southern District of New York indicted Schmidt on three counts: attempted murder of federal agents, in violation of 18 U.S.C. §§ 1114, 2; solicitation of three other people to murder federal officers, see 18 U.S.C. §§ 373, 2; and attempted escape from federal custody, in violation of 18 U.S.C. §§ 751, 2. Although Schmidt had previously been found competent to stand trial in federal court in 1990 and in New York State Supreme Court in 1992, she alleged that she was not now competent to stand trial. Judge Wood conducted a hearing on November 24, 1992 examining that contention and found her competent.

## B. *Pre-Trial Waiver of Counsel*

A day before trial, Schmidt requested the replacement of Anthony Ricco, Esq., the court-appointed counsel who had represented her in her federal case before Judge Sprizzo. Schmidt accused attorney Ricco of incompetence and disloyalty. Judge Wood held a hearing to decide whether to appoint new

counsel. The hearing revealed that Judge Sprizzo had appointed a lawyer to represent appellant for three months from February to April 29, 1992, before he asked to be relieved because of Schmidt's unreasonable demands. The next attorney appointed lasted only until June 24, 1992 because appellant tied up his entire office calling on both of his phone lines at the same time. When appointing attorney Ricco, Judge Sprizzo had stated that he would not appoint any additional lawyers for her and, that if she was dissatisfied, she would have to represent herself.

Judge Wood then appointed attorney Ricco to be Schmidt's lawyer in the instant case, explaining that replacing him would further delay trial and effectively allow Schmidt to manipulate the workings of the court. At the pre-trial hearing, Schmidt said she would waive counsel and proceed *pro se*, whereupon Judge Wood asked Schmidt a series of questions to determine whether her waiver was knowing and voluntary.

Based on its observation during this hearing, the trial court determined Schmidt was intelligent and had some familiarity with criminal proceedings, noting that she had helped other prison inmates with legal matters. It explained to Schmidt that self-representation would require her to demonstrate competence and might therefore conflict with a diminished capacity defense. Judge Wood informed Schmidt of the potential jail term she faced if convicted and strongly urged her not to represent herself. Schmidt nevertheless decided to waive her right to counsel and proceed *pro se*. The trial court then retained attorney Ricco as Schmidt's standby counsel.

## C. *Trial Proceedings*

The government called Colon and Vitello as witnesses at trial to tell how Schmidt had approached them for help in murdering the two agents and escaping from custody. Special Agent Siegler, Inspector Cuff, and Deputy Marshal Leschorn testified regarding their roles in Schmidt's escape attempt. Two witnesses were called to rebut Schmidt's claim of diminished capacity. Dr. Lynda Smith–Harris, head psychiatrist at Elmhurst Hospital, diagnosed the defendant as suffering from an anti-social personality disorder. She explained that Schmidt did not suffer from a severe mental illness and that her symptoms of mental illness were faked. She observed that defendant acted incompetently only when she knew she was being watched by doctors, but otherwise acted appropriately. Dr. Smith–Harris concluded that Schmidt was neither psychotic nor delusional.

Dr. Robert McFall, chief forensic clinical psychologist at the Federal Medical Center in Lexington, Kentucky, gave his findings based on eight interviews with Schmidt. He concluded that the defendant had "a personality disorder with anti-social, narcissistic, and paranoid features" and agreed with Dr. Smith–Harris' opinion that Schmidt was malingering and not suffering from mental illness. Also introduced into evidence were several letters Schmidt wrote her boyfriend and partner-in-crime in which she told him of her intention to fake incompetency as a means of beating the system and evading punishment for her criminal spending spree of January and February 1992.

The defendant called three witnesses. Maria Whittaker testified that Schmidt believed she was related to royalty and thereby showed she was not mentally stable. Patricia Scott gave conflicting accounts of her participation in the crime, and Dr. Brian Ladds, a forensic psychiatrist, testified regarding his treatment of Schmidt over a six-month period, explaining that it was his "guess" that she had a psychiatric problem.

Attorney Ricco represented Schmidt as standby counsel. Schmidt gave her own opening statement and cross-examined some government witnesses. As the trial continued, Schmidt allowed standby counsel to question many of the witnesses and to deliver the closing argument. Although the lawyer handled a substantial amount of the work normally expected of trial counsel, Schmidt frequently reaffirmed her self-representation, including her right to question witnesses, call witnesses, and present a defense. On March 5, 1993 the jury returned a verdict of guilty on all three counts.

## D. *Post-Trial Hearings*

On June 1, 1993 Judge Wood appointed Joel M. Cohen, Esq. to represent Schmidt at

sentencing and in other post-trial proceedings and also ordered additional psychiatric examinations before it reconsidered its competency determination. Separate hearings were held on Schmidt's competence and the validity of the waiver proceedings.

Through attorney Cohen, Schmidt averred that her opening statement and her questioning of witnesses effectively waived her Fifth Amendment right to remain silent and, if she was unaware of that risk, her waiver of counsel might have been unknowing and therefore invalid. Because Schmidt placed her understanding of the law directly at issue, Judge Wood found that she had waived her attorney-client privilege and allowed attorney Ricco to testify at the hearing. New counsel agreed it was appropriate for attorney Ricco to testify. Ricco said he had told Schmidt that her decision to represent herself would require her to act in a capable manner and thereby make it more difficult to convince the jury of her diminished capacity. In a February 13, 1995 sentencing hearing, the district court reaffirmed its original decision that Schmidt's waiver was knowing and intelligent. While acknowledging it did not specifically warn Schmidt of her Fifth Amendment rights, it found she was nonetheless aware of them.

The district court held 13 days of hearings in August 1994 and February 1995 to determine whether Schmidt suffered from a mental illness that rendered her incompetent either to stand trial or to be sentenced. It heard testimony from five doctors who examined the defendant after trial pursuant to court orders. It heard testimony as well as from Dr. Marina Boyadjieva, a doctor who treated defendant before 1976 in Bulgaria, where Schmidt was born and raised. Dr. Luis Gonzalez, another psychiatrist, testified at the defense's request. A number of these witnesses had not testified at defendant's trial, including Drs. Boyadjieva and Gonzalez, who were located by attorney Cohen for these competency hearings. Medical records not submitted at trial were also presented.

Three doctors testified that Schmidt only suffered from a personality disorder or a mild mood disorder. One doctor, Dr. Stephen Teich, believed she suffered from a schizoaffective disorder, and another was of the opinion that she suffered from paranoid schizophrenia. Dr. Teich was the only doctor who considered defendant incompetent. The evidence concerning Schmidt's mental state as a young adult in Bulgaria was discounted as the trial court related its own observations of Schmidt during the proceedings, describing her considerable intelligence and her understanding of both the case and potential defense strategies. The district court determined again that Schmidt was competent at the time of trial and was now competent to be sentenced.

### E. *Sentencing*

Judge Wood rejected several defense arguments in support of a downward departure from the United States Sentencing Guidelines (U.S.S.G.). Schmidt's criminal history category was VI, and her base offense level was 37. The statutory maximums for both the attempted murder count and the solicitation count were 20 years, and the statutory maximum for the attempted escape count was five years. With a guidelines range of 30 years to life imprisonment, the district court imposed consecutive 15–year sentences on the first two counts, and a concurrent five-year sentence on the last count. It ordered this 30–year sentence to be followed by three years supervised release, a $20,000 fine and a $150 special assessment.

Schmidt's appeal from this judgment raises a number of issues, only three of which warrant discussion: the waiver of her right to counsel, whether she was denied the effective assistance of counsel, and whether the government's investigation violated her right to due process. We discuss these issues in order.

### DISCUSSION

#### I Waiver of Right to Counsel

Schmidt argues first that there was an inadequate inquiry to determine whether her decision to waive her right to counsel and proceed *pro se* was made knowingly and intelligently. She contends that our decision in *United States v. Tracy,* 12 F.3d 1186, 1192–94 (2d Cir.1993), required the district

court to ask her specifically if she understood that her Fifth Amendment right to remain silent could be compromised if she represented herself at trial. She also asserts the trial court's inquiry into the Fifth Amendment implications of her waiver violated her attorney-client privilege.

■ A criminal defendant's right of self-representation has existed in Anglo–American jurisprudence since the sixteenth century, having its genesis in the common law rule that no person charged with crime can have a lawyer assigned him against his will. *See Faretta v. California,* 422 U.S. 806, 826, 95 S.Ct. 2525, 2536–37, 45 L.Ed.2d 562 (1975). While the accused usually stands a better chance of maintaining her innocence when represented by a trained and effective lawyer, there are occasions when a person can best represent herself. *Id.* at 834, 95 S.Ct. at 2540–41. Because defendant bears the consequences of a conviction, the decision whether to have counsel or proceed on one's own is one the defendant must be free to make. *Id.* The Sixth Amendment guarantees an accused not only the right to the assistance of counsel, it also guarantees the right to proceed without counsel. To choose the latter obviously means to forgo the former. *United States v. Purnett,* 910 F.2d 51, 54 (2d Cir.1990). Because of this, a trial court must be sure that defendant knowingly and intelligently waived the right to counsel before proceeding *pro se. Id.* at 54–55.

■■ When determining whether the defendant is acting knowingly, the trial court should carefully consider defendant's education, family, employment history, general conduct, and any other relevant circumstances. For a defendant to waive the right to counsel, she must meet the standard for competence to stand trial, that is to say, she must be found competent to waive that right intelligently; it does not mean, of course, that she is necessarily competent to conduct her own defense. *Godinez v. Moran,* 509 U.S. 389, 396–400, 113 S.Ct. 2680, 2685–87, 125 L.Ed.2d 321 (1993).

■ To ensure the waiver is knowing and intelligent, a trial court should engage the defendant in an on-the-record colloquy.

From defendant's answers and from its own observations, the trial court must be persuaded that the waiver is a rational one, and that defendant has the mental capacity to comprehend the consequences of relinquishing a constitutional right. An accused must therefore have had the disadvantages of proceeding without counsel pointed out to her, *Faretta,* 422 U.S. at 835, 95 S.Ct. at 2541; *see also United States v. Hurtado,* 47 F.3d 577, 583 (2d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 266, 133 L.Ed.2d 188 (1995), and must be shown to possess sufficient ability to understand the nature of the proceedings against her. *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam).

■ We are satisfied from the present record that Schmidt's waiver of her right to counsel was constitutionally valid. Judge Wood attempted to persuade defendant to accept the assistance of counsel and explained to her the potential for long-term imprisonment if she was convicted. The trial judge considered defendant's background and experience, and recognized that her prior interactions with the criminal justice system made it more than likely that she understood the serious implications of her decision to proceed on her own.

■ Appellant believes that *Tracy* required the district court to discuss specifically the interaction between her decision to proceed *pro se* and her right to remain silent at trial. In *Tracy,* 12 F.3d at 1194, we affirmed a waiver of defendant's right to counsel. The district court had warned the defendant that self-representation implicates the Fifth Amendment right to remain silent because an accused acting as her own attorney usually questions witnesses. *Id.* at 1193. However, *Tracy* itself makes clear that no one procedure is "talismanic" to an adequate inquiry. *Id.; see Hurtado,* 47 F.3d at 583 (post-*Tracy* affirmance of defendant's waiver of right to counsel without any mention of Fifth Amendment). *Tracy* does not require mention of the Fifth Amendment right, although it is certainly appropriate and, in certain cases, important. In the instant case, both Judge Wood and attorney Ricco explained that Schmidt's attempts to appear

competent to represent herself would likely undermine her diminished capacity defense. Since this was the major danger of her self-representation, it was the appropriate focus of the trial court's inquiry. Thus, even though the court and counsel did not specifically mention the Fifth Amendment, the inquiry conducted was appropriate in the circumstances.

■ Schmidt contends that she was coerced into self-representation because the district court, on the eve of trial, refused to replace her third court-appointed attorney, Ricco. Because the right to counsel of one's choice is not absolute, a trial court may require a defendant to proceed to trial with counsel not of defendant's choosing; although it may not compel defendant to proceed with incompetent counsel. Resolution of whether Schmidt's decision to proceed *pro se* was voluntary hinges on whether defendant's objections to her present counsel had such merit as to entitle her to have new counsel appointed. If so, the decision to proceed *pro se* may not be said to be voluntary because it would have resulted from her being placed in a "dilemma of constitutional magnitude." *See Maynard v. Meachum,* 545 F.2d 273, 278 (1st Cir.1976). We do not believe Judge Wood's direction to Schmidt that she proceed either *pro se* or with attorney Ricco presented her with such a Hobson's choice.

Although attorney Ricco was the third attorney appointed to represent Schmidt in the proceedings before Judge Sprizzo, defendant was as dissatisfied with him as she had been with prior counsel. After a full hearing, the district court found Schmidt's complaints about attorney Ricco baseless and concluded that he could competently represent her. When her motion to have a fourth lawyer appointed for her was denied, Schmidt decided to represent herself.

■ On the eve of trial, just as during trial, a defendant can only substitute new counsel when unusual circumstances are found to exist, such as a complete breakdown of communication or an irreconcilable conflict. *See United States v. Calabro,* 467 F.2d 973, 986 (2d Cir.1972). Here, there were no such circumstances. Hence, we reject

Schmidt's contention that the refusal to replace Ricco as counsel coerced appellant into self-representation.

■ Nor are we persuaded that hearing her lawyer's testimony violated the attorney-client privilege. When the defendant alleged she was never informed of the Fifth Amendment implications of her decision to proceed *pro se,* she put at issue her knowledge regarding how self-representation might affect the jury's consideration of her defense of diminished capacity. Her understanding of the law—a product of her discussions with Ricco—thus became directly relevant to determining the validity of this claim. Moreover, Schmidt's new attorney Cohen twice stated in her presence that he believed attorney Ricco's testimony might be necessary to decide her Sixth Amendment claim. She therefore either impliedly waived the attorney-client privilege or consented, by her silence, to disclosure. *See von Bulow v. von Bulow (In re von Bulow),* 828 F.2d 94, 101 (2d Cir.1987). When the district court inferred a waiver of the attorney-client privilege and relied on Ricco's testimony, it worked no injustice to defendant. *United States v. Bilzerian,* 926 F.2d 1285, 1292 (2d Cir.1991); *see also Rhone–Poulenc Rorer Inc. v. Home Indem. Co.,* 32 F.3d 851, 863 (3d Cir.1994).

## II Ineffective Assistance of Counsel

■ Next, appellant insists that attorney Ricco's performance was so deficient and prejudicial to her that it constituted ineffective assistance of counsel. Specifically, she criticizes his failure to call witnesses and present documentary evidence in support of her diminished capacity defense. At sentencing, attorney Cohen presented evidence, not adduced at trial, including two medical diagnoses of serious mental illness. At trial, the defense only called one medical witness, and his testimony was equivocal. Hence, appellant maintains she would not have been convicted if her former attorney had acted competently and advanced better evidence on her behalf.

This argument fails for three reasons. First, as noted a moment ago, Schmidt

waived her right to counsel and represented herself at trial. The trial court, acting over Schmidt's objection but within its discretion, properly appointed attorney Ricco as standby counsel. *See Faretta,* 422 U.S. at 835 n. 46, 95 S.Ct. at 2541 n. 46; *Williams v. Bartlett,* 44 F.3d 95, 100 (2d Cir.1994). Standby counsel examined and cross-examined some witnesses, and gave the defense summation. However, Schmidt frequently reaffirmed that she was her own counsel. Having chosen to represent herself, she may not now be heard to complain that her own shortcomings spell out some sort of constitutional deprivation. *Faretta,* 422 U.S. at 834–35 n. 46, 95 S.Ct. at 2541 n. 46.

Second, there is no constitutional right to hybrid representation of the kind defendant received here where she shared the duties of conducting her defense with a lawyer. *See McKaskle v. Wiggins,* 465 U.S. 168, 183, 104 S.Ct. 944, 953–54, 79 L.Ed.2d 122 (1984). Absent a constitutional right to standby counsel, a defendant generally cannot prove standby counsel was ineffective. *See United States v. Cochrane,* 985 F.2d 1027, 1029 & n. 1 (9th Cir.1993) (per curiam) (rejecting ineffective assistance of standby counsel argument in this context without foreclosing argument in future); *United States v. Windsor,* 981 F.2d 943, 947 (7th Cir.1992) (no constitutional right to effective assistance of standby counsel).

As might be expected, a standby counsel's duties are considerably more limited than the obligations of retained or appointed counsel. *Tate v. Wood,* 963 F.2d 20, 26 (2d Cir.1992). Although Ricco's role expanded as the case continued, he did not play the same role that defense counsel normally would in preparing the strategy for a criminal defense. Perhaps in a case where standby counsel held that title in name only and, in fact, acted as the defendant's lawyer throughout the proceedings, we would consider a claim of ineffective assistance of standby counsel. This is not such case. Because Schmidt proceeded *pro se,* she may not now assign blame for her conviction to standby counsel.

Third, even if we considered attorney Ricco to have served as Schmidt's trial lawyer, we would still reject her claim of ineffective-

ness. Under the two-prong test of *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), the defendant must prove that Ricco's representation fell below an objective standard, measured by professional norms, of reasonableness, *id.* at 688, 104 S.Ct. at 2064–65, and that "the decision reached would reasonably likely have been different absent the errors." *Id.* at 696, 104 S.Ct. at 2069.

Attorney Ricco's performance as standby counsel was objectively reasonable. When asked, he successfully cross-examined the government's witnesses, sometimes forcing them to make admissions helpful to the defendant. He contacted potential witnesses and considered the utility of their testimony. Although it was ultimately decided not to call most of these witnesses, the tactical decision of whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation. *See United States v. Romero,* 54 F.3d 56, 60 (2d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1449, 134 L.Ed.2d 568 (1996); *United States v. Aiello,* 900 F.2d 528, 533 (2d Cir.1990).

In hindsight, it might have been helpful had Drs. Teich and Boyadjieva testified at the trial, rather than only in the posttrial proceedings. Although it is possible the jury would have accepted Schmidt's defense had this evidence been presented, appellant has not demonstrated that this additional evidence would have made it reasonably likely the jury would have reached a different result. Whatever the impact of this additional medical proof, the jury would necessarily have weighed it against the government's strong proof—its expert witnesses and Schmidt's letters in which she tells her boyfriend of her plan to feign insanity—that showed Schmidt was not suffering from mental illness, but was malingering.

In addition, review of Ricco's advocacy is deferential to the lawyer's perspective at the time and is not made through the 20/20 lens of hindsight. *See Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065; *United States v. Jones,* 918 F.2d 9, 11 (2d Cir.1990) (per curiam). After a review of the entire record, we concur in Judge Wood's assessment that

attorney Ricco's performance at trial met or exceeded a professional standard of reasonableness. In short, because Schmidt fails to meet either prong of the *Strickland* test, her ineffective assistance of counsel claim would not succeed.

### III  Due Process: Outrageous Government Misconduct

■ Finally, Schmidt maintains that the government sting operation that led to her arrest violated principles of fundamental fairness and therefore denied her the Fifth Amendment's guarantee that she not be deprived of liberty without due process of law. Appellant argues that she committed "a purely verbal crime" and, due to her mental illness and presence in the mental observation unit when she proposed her plan, the government should not have undertaken its elaborate sting operation.

The concept of fairness embodied in the Fifth Amendment due process guarantee is violated by government action that is fundamentally unfair or shocking to our traditional sense of justice, *see Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 246, 80 S.Ct. at 303–04, 4 L.Ed.2d 268 (1960), or conduct that is "so outrageous" that common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction against the accused. *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973). But, as Justice Powell in his concurring opinion in *Hampton* stated, "[p]olice overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction." *Hampton v. United States*, 425 U.S. 484, 495 n. 7, 96 S.Ct. 1646, 1653, 48 L.Ed.2d 113 (1976).

Ordinarily such official misconduct must involve either coercion, *Watts v. Indiana*, 338 U.S. 49, 55, 69 S.Ct. 1347, 1350, 93 L.Ed. 1801 (1949) (six days of intense interrogation of accused), or violation of the defendant's person, *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209–10, 96 L.Ed. 183 (1952) (forcible extraction of accused's stomach contents). Absent such extreme misconduct, relief in the form of reversal of a conviction is rare. *United States v. Myers*, 692 F.2d 823,

837 (2d Cir.1982); *United States v. LaPorta*, 46 F.3d 152, 160 (2d Cir.1994). Notions of respect for due process would create serious concern were sting operations designed to ensnare people who may suffer from mental illness the government's standing order of the day. But, we cannot say the government acted improperly in the case at hand.

Because Schmidt approached others with her detailed scheme to murder the federal officers and escape from custody, she bears a heavy burden in demonstrating government misconduct, an issue frequently raised that seldom succeeds. *United States v. Santana*, 6 F.3d 1, 4 (1st Cir.1993). Nevertheless, a claim that the government has acted outrageously is taken seriously because ensuring that the government does not trample in an unconscionable manner on individual dignity is a bed-rock duty of judicial officers. Sometimes the government's involvement in manufacturing crime is demonstrably outrageous, and in those cases, the convictions of targeted defendants have been set aside. *See, e.g.*, *United States v. Lard*, 734 F.2d 1290, 1292, 1296–97 (8th Cir.1984) (involving ATF agents who helped defendants make a pipe bomb); *United States v. Twigg*, 588 F.2d 373, 378 (3d Cir.1978) (involving DEA agents who conceived drug crime and supplied defendants with the means to accomplish it).

The district court first denied Schmidt's motion to dismiss the indictment for government misconduct at a pre-charge conference. At sentencing, it again rejected appellant's contention that the instant case—which it found factually distinguishable—resembled and should be controlled by *State v. Leadingham*, 190 W.Va. 482, 438 S.E.2d 825, 834 (1993). There defendant while in prison, approached an about-to-be-released inmate and told him he wanted his wife killed. The inmate contacted the police and agreed to serve as an undercover informer. When the now-released inmate went to visit Leadingham, the defendant was undergoing court-ordered psychiatric testing at a state hospital to determine his competency to stand trial. Defendant again asked that he kill his wife or her attorney and gave detailed instructions. *Id.*, 438 S.E.2d at 827–28. The Supreme Court of West Virginia suppressed the state-

ments defendant made to the inmate due to what it believed was outrageous government misconduct. *Id.* at 834. Especially troubling to the court was the police decision to send an undercover informer into a state psychiatric facility to obtain statements from a defendant undergoing a court ordered competency examination without trying to determine defendant's mental status at the time. Defendant was in fact, diagnosed as suffering from a bipolar disorder that could make it impossible for him to stand trial. *Id.* at 832–33.

We recognize the government's involvement in Schmidt's plan was extensive. Inspector Cuff posed as a hit man and talked with Schmidt in that capacity and federal agents actually conducted a controlled breakout from Rikers Island. Had the government not launched its sting operation, Schmidt contends she would have simply remained in the mental observation unit, talking to anyone who would listen to her. However, it is also possible that she would have eventually found an inmate willing to help her carry out her detailed instructions to kill federal agents and assist her in an escape beyond this country's borders. While the government did far more here than simply follow up the defendant's proposed crime, *United States v. Carpentier,* 689 F.2d 21, 27 (2d Cir.1982), there are occasions when the government is required to appear to participate in a criminal conspiracy in order to gather evidence of illegal conduct, *United States v. Corcione,* 592 F.2d 111, 115 (2d Cir.1979), or, as here, to prevent it.

When the United States Marshals—posing as hit men—offered to carry out her plan to execute a contract hit on federal agents, she readily agreed to hire them. *See United States v. Romano,* 706 F.2d 370, 372 (2d Cir.1983). But the plan originated with her. When police do no more than facilitate a criminal enterprise started by another, due process principles are not violated. *See United States v. Asencio,* 873 F.2d 639, 641 (2d Cir.1989).

Ostensibly more compelling is the argument that this sting operation was taken against a woman who had at least a colorable claim of mental illness and was, at the time of the government operation, in the mental observation unit at Rikers Island. Yet, such confinement was at her own request, and her letters to her boyfriend, which told of her intention to fake mental illness to avoid being tried for another crime, suggest malingering. The government saw those letters, and also knew a State court had found her competent to stand trial in May 1992. At that competency hearing, a psychiatrist testified that Schmidt was malingering and, though she had a personality disorder, was not suffering from mental illness.

In her brief, Schmidt argues that the government should be estopped from claiming that she was competent at the time of the June 1992 investigation because of its April 1996 petition to commit Schmidt to a mental health institution. Concededly, the government's petition in the Texas proceeding asserted that Schmidt is *now* suffering from a mental disease or defect. But, this view of her present mental state occurred more than four years after the trial. The government had before it evidence of Schmidt's sanity and the serious nature of her plan in 1992, and was not required to anticipate this recent development.

In sum, we cannot say the government's conduct here reached a demonstrable level of government outrageousness so as to deprive Schmidt of her liberty without due process of law.

### IV Remaining Contentions

The appellant contends finally that she was improperly sentenced, and that insufficient evidence supported her conviction for attempted murder. We have considered these remaining contentions and find them to be without merit.

### CONCLUSION

Accordingly, we affirm the judgment and sentence of the district court.