UNITED STATES of America, Appellee,

v.

Arthur MORRISON, Defendant–
Appellant.

No. 97–1370.

United States Court of Appeals,
Second Circuit.

Argued March 9, 1998.

Decided Aug. 13, 1998.

36

Daniel H. Murphy, II, Pelham Manor, NY, for Defendant–Appellant.

Roman E. Darmer II, Assistant United States Attorney, Southern District of New York (Mary Jo White, United States Attorney, Ira M. Feinberg, Assistant United States Attorney, of counsel), for Appellee.

Before OAKES, WALKER and MAGILL,* Circuit Judges.

OAKES, Senior Circuit Judge:

Arthur Morrison appeals from a judgment of conviction and sentence of incarceration for three hundred months followed by three years of supervised release, entered on April 14, 1997, in the United States District Court for the Southern District of New York, Kimba M. Wood, *Judge.* Morrison was convicted, after a three-week trial by jury, of five counts of transmitting through interstate commerce threats to injure the property and reputation of the investment firm of Smith Barney, Harris Upham & Co. ["Smith Barney"] and one of its managing directors, with the intent to extort money, in violation of 18 U.S.C. § 875(d); four counts of wire fraud in violation of 18 U.S.C. § 1343; and five counts of transmitting in interstate commerce threats to injure certain persons, in violation of 18 U.S.C. § 875(c).

Morrison, through his counsel, claims that the district court erred in finding him competent to represent himself in his trial. Morrison challenges, both through counsel and pro se, the district court's decision to allow him to represent himself at a hearing in which Morrison's competency was at issue, the sufficiency of the evidence to establish that certain of Morrison's communications took place across state lines, and the district court's substantial upward departures from the

---

* The Honorable Frank J. Magill of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

United States Sentencing Guidelines. Morrison, pro se, finds additional error in the district court's denials of his motion for recusal of Judge Wood and his motions to dismiss the indictment filed against him, and claims the Government offered insufficient evidence to establish guilt for each count for which he was convicted. Morrison also challenges the district court's rulings concerning admission of certain evidence at his trial, and he claims that his standby counsel ineffectively assisted him, that the Government engaged in vindictive prosecution of him, and that the Government destroyed exculpatory evidence. We reject each of Morrison's arguments and affirm.

### I. Procedural History

Morrison was arrested July 29, 1992, in Newark, New Jersey. Represented by counsel, Morrison pled guilty on November 13, 1992, to two counts of the original indictment filed against him. On February 1, 1993, Morrison submitted a pro se letter to the court, seeking to withdraw his plea, claiming that he misunderstood the terms of his plea agreement, and asking that new counsel be appointed. On February 3, 1993, the court granted Morrison's motion for appointment of new counsel. On February 8, 1993, Morrison requested that yet another attorney be appointed, and on February 19, 1993, the court appointed Ellen Yaroshefsky to represent him. Represented by Yaroshefsky, Morrison filed a motion to withdraw his guilty plea, including Yaroshefsky's affidavit submitting that Morrison might be suffering from a psychiatric disorder. On May 7, 1993, the court held a pre-trial conference, in which Morrison requested that new counsel be appointed, in part based on his disagreement with her allegations regarding his mental health. However, Yaroshefsky insisted at this conference that while she thought Morrison might have a defense to the charges based on his mental health, she found no question that Morrison was competent to stand trial. She stated that she had had lengthy conversations with Morrison that left no doubt in her mind that he was able to assist in his own defense, as he had in fact already done so.

On July 1, 1993, Morrison filed a motion to dismiss Yaroshefsky and for leave to represent himself pro se. The district court found that there was reasonable cause to conduct a competency hearing in light of Morrison's pro se filings and his behavior in court, and stated that she would postpone ruling on Morrison's motion to represent himself until after Morrison had been examined by a psychiatrist. Over Morrison's objection, the district court ordered Morrison to submit to a psychiatric examination by Dr. Naomi Goldstein. Because Morrison refused to comply with this order, the district court ordered Morrison to be transported to a federal medical center for evaluation, as provided in 18 U.S.C. §§ 4241 and 4244.

Although Morrison refused to cooperate in his psychiatric evaluation at the Federal Medical Center in Rochester, Minnesota ["FMC"], a psychologist at the FMC issued a report on Morrison's medical condition. The report stated that Morrison was "alert," "calm" and "articulate," and that it was "highly unlikely" that Morrison suffered from any acute schizophrenic condition. While the report acknowledged that Morrison's refusal to cooperate hindered efforts to conduct the evaluation thoroughly, the report noted "no obvious aberrations in ∴ . . thought" and that "his speech was rational and goal-directed, without any evidence of confusion." While the author of the report stated that he could not rule out the possibility of delusional ideas, and found some suggestion of "grandiose or paranoid delusions" in some of Morrison's statements, the report concluded that "we have found no clear evidence to support a conclusion he is currently in need of custody for care or treatment. . . ."

The court held a pre-trial conference on January 31, 1995, and found, based on the FMC report, that no reason existed to believe that Morrison was not competent to represent himself. The district court then advised Morrison of the potential penalties he faced if convicted, questioned him about his legal training and experience, explained the risks of self-representation, including compromise of his right against self-incrimination under the Fifth Amendment, and repeatedly advised Morrison to avail himself of

counsel. Morrison nonetheless elected to represent himself. The district court ruled that Morrison would be permitted to represent himself, but assigned Yaroshefsky to act as Morrison's standby counsel, over Morrison's objection. After conducting several evidentiary hearings, the district court granted Morrison's motion to withdraw his guilty plea on February 9, 1996, and began trial preparation.

Shortly before trial, the district court relieved Yaroshefsky, at her request, and appointed Thomas F.X. Dunn to serve as Morrison's standby counsel.

On May 6, 1996, the district court held a pre-trial conference, expressing renewed concern regarding Morrison's competence. Certain investigations that Morrison requested to be performed led the court to wonder whether Morrison was delusional or simply making things up in order to delay the proceedings. Therefore, the court asked Dr. Goldstein to attend the conference in order to observe Morrison and help the court to resolve the issue. During the course of the conference, Judge Wood ruled on numerous motions filed by Morrison, and Morrison discussed in the presence of Dr. Goldstein the witnesses he wanted to call in his defense. At the end of the conference, Judge Wood called Dr. Goldstein to the witness stand, and advised Morrison and his standby counsel that Dr. Goldstein was available to them for cross-examination. Dr. Goldstein testified that Morrison understood the charges and proceedings and was capable of working with standby counsel. She based her opinion, inter alia, on her observations of Morrison at the conference, review of the charges against Morrison and some of the evidence the Government intended to submit against him, transcripts of Morrison speaking in court at prior conferences, and the FMC report. Morrison chose not to cross-examine Dr. Goldstein at that time. Based on Dr. Goldstein's testimony, and all the other evidence before her, Judge Wood found Morrison competent to stand trial.

Judge Wood then informed Morrison again of the dangers of representing himself, including the possibility of long-term imprisonment should he receive consecutive sentences for conviction on multiple counts. Morrison continued to assert his right to proceed pro se, and Judge Wood ruled that Morrison had chosen to do so knowingly and intelligently. Morrison did act as his own attorney at his trial.

Morrison's trial began May 29, 1996, and continued through June 21, 1996. A grand jury returned a superseding indictment shortly before Morrison's trial that contained fifteen counts. The indictment charged in Counts One through Five that Morrison "unlawfully, wilfully and knowingly, and with intent to extort money from ... Smith Barney, did transmit in interstate commerce communications containing threats to injure the property and reputation of Smith Barney and Marianne Spraggins," specifically setting forth five approximate dates of the call, and describing each charged call, in each of which Morrison threatened to contact media, public officials, or Smith Barney clients, or to sue Smith Barney and Spraggins. The indictment charged in Count Six that Morrison willfully and knowingly transmitted in interstate and foreign commerce a communication containing a threat to injure Spraggins, in that he called her at her New York City apartment and threatened to break her legs and neck. In Counts Seven through Ten, the indictment charged that Morrison unlawfully, willfully and knowingly devised a scheme and artifice fraudulently to obtain money by means of false representations, and transmitted in interstate commerce communications for the purpose of executing that scheme; specifically, that Morrison made misrepresentations in an attempt to obtain more than one hundred thousand dollars, to which he was not entitled, from Smith Barney. The indictment provided four approximate dates in March in which Morrison telephoned Smith Barney to execute his fraudulent scheme, alleging that Morrison called from Tampa, Florida, and spoke with James Boshart and George Saks at Smith Barney in New York, falsely claiming that Spraggins had promised to invest and quadruple his money, that he had given Spraggins one hundred thousand dollars in cash, and that Spraggins and Smith Barney had stolen money from Muhammad Ali. In Counts Eleven

through Thirteen, the indictment charged Morrison with having transmitted threats to injure Dr. Cheryl Cochrane to Dr. Cochrane's father in the Bronx, New York, from California, in approximately August, September, and October, 1989. Count Fourteen charged Morrison with transmitting via interstate commerce threats to injure the persons of Keith Newton and Cheryl Cochrane, to Helen Newton, a physician and colleague of Dr. Cochrane. This charge was withdrawn by the Government at the close of its case in chief. Count Fifteen [1] charged Morrison with transmitting in interstate commerce communications containing threats to injure Laura Gumes [2], in that he telephoned her at her place of business in New York, New York, from Nevada and elsewhere, from approximately June 1991 through March 1992, and threatened to injure her. The jury found Morrison guilty on all fourteen remaining counts on June 21, 1996.

## II. Facts

The Government first presented the testimony of Dr. Cheryl Cochrane to establish Morrison's course of harassment of her. Cochrane testified Morrison began to harass her after Cochrane ended a long-term relationship with Morrison in the spring of 1989. She testified that Morrison began calling her incessantly at home and work, and when he reached her would threaten to have someone disfigure her or to harm someone in her family. Cochrane obtained a restraining order in an attempt to force Morrison to leave her alone, but was unable to have him served. Cochrane testified that although she had the locks changed on the apartment she had shared with Morrison, she moved after Morrison broke into the apartment. She changed her telephone number as well. She had her belongings placed in storage, only to have them released to Morrison without her authorization. Her belongings were never returned. Cochrane hid her whereabouts even from people close to her, because Morrison called everyone who knew her, trying to get information about where she was.

Cochrane allowed her own family to reach her only by her pager.

Cochrane stayed with a colleague after leaving the apartment she had shared with Morrison, and then moved in with her boyfriend, Warren Woods, only to begin receiving calls from Morrison there. Eventually, she gave up answering the phone altogether, and allowed either the answering machine or someone else to answer. Morrison left messages on her machine, threatening to harm Cochrane if she did not leave California. Cochrane testified that Morrison called her ten or twenty times per day. Morrison also called, or had others call, the hospital where she worked, ten or twenty times per day, and often pretended to be a member of Cochrane's family or a colleague so that Cochrane would take the calls. Cochrane and Woods decided to move from Woods's apartment when Morrison began sending his friends to their home as well as calling there; they moved in the middle of the night, leaving lights and an answering service on, so that it would appear, even to neighbors, that they continued to live there. Cochrane and Woods bought a shot gun, which they kept in the house, and Cochrane learned to use it. They kept secret their new address, and got a post office box so they would not receive mail at their home. Even Cochrane's family did not know where she lived, and she allowed no one to come to her house socially. Cochrane testified that she continued to receive calls from Morrison at each hospital at which she worked through 1992.

Dr. Cochrane's family members testified that Morrison harassed them severely, continually trying to locate her. In August, September, or October of 1989, Morrison called Dr. Cochrane's father, Nathaniel Cochrane, several times at his home in the Bronx, New York. Mr. Cochrane testified that Morrison sometimes told him that he was calling from L.A., sometimes from New York. On cross-examination, Mr. Cochrane stated that in one call made in August, September, or October of 1989 Morrison stated he was call-

---

1. Because Count Fourteen was withdrawn, the original Count Fifteen was renumbered as Count Fourteen.

2. While the indictment states Gumes's first name as Laura, Gumes gave "Lauren" as her first name when she testified at trial.

ing from New York. Mr. Cochrane testified that when Morrison reached him, he would threaten to disfigure Dr. Cochrane or to have someone else disfigure her, and that he made this threat approximately four times. Morrison told Mr. Cochrane that he would destroy Dr. Cochrane's career, and that he wanted Dr. Cochrane to move back to New York so that he could save face among his friends in California. Mr. Cochrane testified that he continued to receive calls from Morrison for the next three years, approximately twice a month, in which Morrison attempted to learn Dr. Cochrane's whereabouts.

Gussie Cochrane, Dr. Cochrane's mother, testified that she began receiving threatening calls from Morrison after Dr. Cochrane broke up with Morrison. In April of 1989, Morrison called Mrs. Cochrane in the early morning hours, claiming that Dr. Cochrane had been killed, and that Mrs. Cochrane was to come to Los Angeles to the morgue to claim her daughter's body. Dr. Cochrane's brother, Darren Cochrane, testified that Morrison also called him early that morning and told him that Dr. Cochrane was dead. Mrs. Cochrane stated that she fainted when she heard this, and was unable to function until she and the family learned several hours later that Morrison's claim was untrue. Morrison continued to call Mrs. Cochrane over the next three years, often numerous times a day, directing threats toward Dr. Cochrane. Morrison threatened Mrs. Cochrane, "When you see your daughter, you're not going to recognize her face. I'm going to beat her face in." Mrs. Cochrane testified she feared that Morrison would seriously maim or kill her daughter. Morrison told Mrs. Cochrane that if Dr. Cochrane attended the funeral of Dr. Cochrane's grandfather, to whom she was extremely close and who had raised her as a small child, she would be harmed at the airport. Mrs. Cochrane told her daughter that coming to the funeral would not be safe, and Dr. Cochrane missed the funeral as a result.

Dr. Cochrane's brothers both testified that they received harassing calls from Morrison. Darren Cochrane stated that he received calls beginning in early 1990 from Morrison, asking the whereabouts of Dr. Cochrane.

Darren Cochrane testified that he unplugged his phone on one occasion and that he had his telephone number changed as a result of Morrison's repeated calls, although Morrison was able to obtain the new number almost immediately. Dr. Cochrane's brother, Saadiq Mustafaa Cochrane, testified that in 1989 he began receiving numerous calls, four or five per day, from Morrison at his workplace, and that Morrison frequently threatened to have Dr. Cochrane's face disfigured. Saadiq Mustafaa Cochrane testified that Morrison's calls "devastated the family. It is a very, very uncomfortable situation because my sister was somebody that I always would call, we would spend time together, and that is not able to happen right now."

In addition to harassing Dr. Cochrane and her family by phone, the Government presented evidence that Morrison actively attempted to sabotage Dr. Cochrane's reputation and her career. Morrison filed a car theft claim against Dr. Cochrane with the Beverly Hills Police Department in April of 1989. Sergeant Micaela Hines of the Beverly Hills Police testified that after speaking with both Cochrane and Morrison, she determined the claim to be false and obtained a warrant to arrest Morrison for making the false claim. Sergeant Hines did not arrest Morrison because she was unable to locate him. From April 1989 through the end of 1991, Sergeant Hines testified she received numerous telephone calls, often several a day, from Morrison at the Police Department in Beverly Hills. In these calls, Morrison taunted Sergeant Hines, often in an obscene manner. Sergeant Hines testified that Morrison boasted to her that he planned to ruin Cochrane's life and cause her to lose her medical license.

On July 7, 1989, someone called the Dominguez Hills Medical Center, where Dr. Cochrane worked, and told a security employee, Dale Smith, that there was a bomb in the hospital and that the hospital must be evacuated within fifteen minutes. The director of facilities and services, James Spinelli, testified that he received two phone calls related to the bomb threat, in the first of which the caller claimed to be an FBI agent, validating the bomb threat and order-

ing that the emergency room and the lobby be evacuated. In response, Spinelli had the emergency room closed and ambulances and paramedics routed to other hospitals. Spinelli tape recorded the next call, and Cochrane identified the voice of the caller as Morrison when the tape was introduced as evidence at Morrison's trial. In that call, Morrison ordered Spinelli to evacuate the first two floors, as the emergency room was on the first floor. Upon search of the hospital, no bomb was found.

During the summer of 1989, Cochrane began to prepare to take the national emergency medicine certification examination, scheduled for November 1989. The examination is administered by the American Board of Emergency Medicine ["ABEM"], and is required for physicians to become certified in emergency medicine as a specialty. Approximately two thousand physicians were scheduled to take the 1989 examination in eight cities across the country, and two hundred were to take a re-certification examination on the same date. Cochrane took a month off from work to prepare, and enrolled in an examination review course. Benson Munger, executive director of the ABEM, testified that in late October 1989, the ABEM began receiving telephone calls regarding Cheryl Cochrane, in which the caller attempted to find out where and when Cochrane would be taking the examination. The caller also claimed Cochrane was a homosexual, a child molester, and a bad doctor. Munger testified that at the end of October 1989, a brick was thrown through a window of the ABEM's office, to which a note was attached with Cochrane's name on it and the statements "I'll be looking for her at the testing. She is a child molester." Munger testified that around this time the ABEM received a document entitled "Lesbianism in Medicine" and subtitled "Dr. Cheryl F. Cochrane, MD." The document, sent anonymously, accused Cochrane of spreading the AIDS virus and of engaging in homosexuality, and falsely stated that Cochrane had been barred from practicing at Dominguez Hills and at the California Medical Center in Los Angeles. The note and the document were admitted as evidence. As a result of these incidents, the ABEM determined to cancel the November 1989 ex-

amination, believing Cochrane and others might be in danger. Munger testified that cancellation of the exam resulted in over fifty thousand dollars in direct expenses alone. The ABEM postponed the examination until May 1990, resulting in extreme inconvenience and expense to over two thousand doctors nationwide. The ABEM required that Cochrane take the May examination alone at a separate, secret location in order to protect the other exam takers.

Around the time the exam was canceled, Detective Patricia Nowak of the East Lansing Police Department assumed the investigation of the threats against Cochrane received by the ABEM. Detective Nowak testified that shortly after she began investigating the incidents, Morrison began to call her at the Police Department, identifying himself by name. Morrison told Detective Nowak to stop passing around his name or he would have to teach her a lesson. Detective Nowak testified to numerous conversations in which Morrison threatened Cochrane, including one in which he threatened that Cochrane would either submit to him or kill herself, or become institutionalized, so that "no one else will have her." Morrison also threatened Detective Nowak herself, and at one point threatened to blow up the police department.

At the time Cochrane testified, she stated she still did not let others know where she lived, that she still did not accept visitors, and that her friends and family still did not contact her directly. She described her experience with Morrison as "worse than anything I could imagine" and "the worst experience of my life."

The Government presented evidence that Morrison directed a similar course of conduct against Marianne Spraggins, whom he met in early 1991. At that time, Spraggins was a managing director in the municipal finance department of Smith Barney. Spraggins testified that she and Morrison dated briefly until Spraggins ended the relationship at the end of April 1991. However, Morrison continued to call Spraggins repeatedly at her home and office, demanding that she see him.

Spraggins testified that in December of 1991 Morrison's calls became increasingly threatening, and that he told her in one call he would break her neck if he caught her with another man; in another, he threatened to break her legs. Spraggins testified that Morrison told her he was calling from Florida during the calls she received in December 1991.

Spraggins stated that in April 1991, Morrison gave her a check for eight thousand dollars from Joseph Prischack; Morrison asked her to cash the check for him, and she did. Spraggins testified that in early 1992, Morrison began calling her about eight thousand dollars he claimed she owed him. Spraggins testified that Morrison demanded various amounts of money and threatened to call her superiors at Smith Barney and the head of the firm. In addition, he threatened to call all of the black mayors in the country, many of whom were Spraggins's clients. Spraggins testified that she took these threats extremely seriously, because "[i]n the work that I did and in my profession, the only thing I really have is my word and reputation which were unblemished."

Morrison did contact senior executives at Smith Barney beginning in March of 1992, including Frank Zarb, the Chief Executive Officer, George Saks, the General Counsel, and James Boshart, head of the municipal finance department and Spraggins's direct superior. Smith Barney began to tape record these conversations, and tape recordings of conversations between Morrison and Boshart and Saks were introduced as evidence at Morrison's trial. The Government also offered the testimony of Boshart and Saks. Saks testified that over the course of ten or twelve days in March of 1992, Saks received five or ten more calls from Morrison, in which he identified himself by name. Saks testified that Morrison told him at times in these calls that he was calling from Tampa, Florida. Morrison told Saks that Morrison had given Spraggins money that was supposed to be invested through Smith Barney, but that Spraggins had instead stolen the money. To both Boshart and Saks, Morrison threatened to disclose to Smith Barney's customers, competitors, and the press his allega-

tion that Spraggins had defrauded Muhammad Ali and the United Negro College Fund. Morrison also threatened that every black mayor in America would learn that Smith Barney defrauded Muhammad Ali and the United Negro College Fund. Morrison assured Smith Barney that he was serious about contacting the press, and claimed that he had talked to the New York Times for an hour, and that they very much wanted the story.

Spraggins testified that all Morrison's calls to her and to her employer were "very very devastating. While they were going on, I was afraid all the time. I was upset all the time. I never knew what the next thing was that was going to happen. It just seemed like it was just escalating and escalating, and I was very, very fearful." Spraggins testified that she took steps to buy a gun as a result of Morrison's actions.

The Government also offered the testimony of Lori Mays, a woman who allowed Morrison to stay at her Tampa, Florida, apartment intermittently, whenever he needed to be in town for his business, beginning in approximately May of 1991. Mays testified that he stayed there occasionally for about one year. Mays testified that Morrison told her that he had given Spraggins eight thousand dollars in Las Vegas, and that Morrison boasted to Mays that he had frightened Spraggins so much that she was going to give Morrison the money. The Government offered into evidence Mays's telephone bills, which documented calls to Smith Barney.

In May 1991, Morrison met Lauren Gumes, a fashion model. Gumes testified that Morrison approached her and asked if she were interested in modeling in a commercial. In July of 1991, Morrison invited Gumes to attend a boxing match in Las Vegas with him. Gumes accepted on the condition that she be allowed to bring a friend and sleep in a separate room. Gumes testified that in Las Vegas she went out with Morrison as part of a group, and that during the course of the evening Morrison punched her on the leg when she refused to sit in a particular seat at a night club. Gumes testified that she and her friend left the group because of Morrison's treatment of them.

When Gumes returned to her hotel, she found Morrison in her hotel room; he told Gumes that the two women had "violated him" by leaving the club. After Morrison left the room, Gumes discovered that her return airline ticket was missing from her luggage. Gumes testified that during the course of trying to get her tickets back from Morrison, Morrison told Gumes, who had been adopted, that he was going to try to locate her biological parents. Gumes testified that it was extremely upsetting to her to hear Morrison speak of her biological parents and claim he was going to find them. Gumes prepared to leave with her friend, and as they were leaving Morrison threatened that if Gumes did not come back, he would have her fired from her job as a sales clerk, by telling her boss that she was a prostitute and that she had stolen money. Gumes testified that when she returned to New York, there was a message on her answering machine from Morrison saying, "I'm going to get you." Gumes testified that before she even left Las Vegas, she called her employer, and discovered that Morrison had already called and spoken to her manager, claiming that Gumes was a prostitute and had stolen money. For several months in late 1991 and early 1992, Morrison called Gumes at her job, speaking to Gumes's manager, up to five or ten times a day.

In the fall of 1991, Gumes was transferred to another store, and her co-workers were instructed not to inform anyone where she was. Morrison nonetheless managed to discover her new workplace telephone number and began to call there; Gumes testified that he would call as many as fifteen times within ten minutes, and she would continue to hang up the phone. Gumes testified that the tenacity Morrison demonstrated in finding her made her feel that he would stop at nothing to get to her. Gumes testified that she continued to receive calls until the end of 1991 or the beginning of 1992.

In his defense, Morrison offered his own testimony and that of ten witnesses, a tape recording of a conversation between himself and Spraggins, and records of Spraggins's bank accounts. Morrison testified that he broke up with Cochrane after finding her with another man, and that he never spoke to her again. Morrison admitted that he hired a locksmith to enter the apartment he had shared with Cochrane in California, and that when he heard people outside the front door, he jumped out through the second-story bedroom window and broke both of his feet. Morrison admitted to making two telephone calls to Nathaniel Cochrane, but claimed that he drove from California to New York, with his two broken feet and a cast on his leg, before making the calls. Morrison claimed that he called Mr. Cochrane only to tell him that he wanted to get back together with Dr. Cochrane. He denied making threats to disfigure Dr. Cochrane to any member of her family, or threatening to hurt Dr. Cochrane if she attended her grandfather's funeral. Morrison also denied making the bomb threats directed at the hospital where Cochrane worked, the ABEM, and the East Lansing Police Department.

Morrison testified that Spraggins promised to invest eight thousand dollars on behalf of the United Negro College Fund in penny stocks and to quadruple the money. Morrison claimed that Prischack sent Spraggins the money and that Spraggins never gave eight thousand dollars cash back to Morrison. Morrison also testified that Spraggins received between seventy and ninety thousand dollars in cash in Las Vegas that she was supposed to use to help start a pharmaceutical company. Morrison testified that Spraggins also received sixteen million dollars from certain Iraqi businessmen as part of Morrison's and his associates' business venture.

Morrison asserted that his relationship with Spraggins did not end until February 1992, and he denied that he ever threatened to hurt Spraggins. Morrison claimed he was contacted by Boshart regarding the money he had given Spraggins to invest, and that Boshart recommended that he call Frank Zarb. Morrison generally asserted that the conversations introduced into evidence between Smith Barney and Morrison constituted business negotiations, not threats by Morrison against Smith Barney.

Regarding Lauren Gumes, Morrison denied that he punched her the evening they spent together in Las Vegas. He denied

calling Gumes's New York City apartment and leaving a message on her answering machine. Morrison claimed that he called her from Buffalo, New York, and that no one answered the phone. Morrison testified that he only telephoned her twice more to ask her about five thousand dollars that had been stolen from Evel Knievel during their trip to Las Vegas, and denied ever calling Gumes at her job.

At trial, Morrison challenged the admission of tapes made by the Government of his calls to Smith Barney, and claimed they had been altered. He called Thomas Owen as an expert to testify that the recordings displayed anomalies that indicated they had been edited. Morrison called several witnesses to testify that his relationship with Spraggins lasted longer than she had acknowledged. He called an employee of Chemical Bank to introduce Spraggins's bank records; the employee testified that the records indicated that Spraggins had transferred two hundred thousand dollars from her checking account to her savings account on May 24, 1991. Morrison called Renold Francis and Sonny Allen to testify that they met with Morrison in New York during the period August through October 1989, the period in which Morrison was charged with making threatening communications to Nathaniel Cochrane. Francis testified that he saw Morrison on nine or ten occasions during that period, and Allen could not specifically recall seeing Morrison in New York then. Morrison also called FBI agent Harold Brantley to testify that he interviewed Nathaniel Cochrane in August 1992, but that he prepared no written report. Mr. Cochrane had testified on cross-examination by Morrison that he had never been interviewed by the FBI.

The Government rebutted by calling as a witness Bruce Koenig, an expert in forensic analysis of tape recordings, to testify that the tape exhibits challenged by Morrison were authentic and had not been altered, disputing Owen's methodology and offering innocent explanations for the issues identified by Owen.

## III. Discussion

### A. Morrison's Competency to Stand Trial and to Waive Counsel

 Morrison, through counsel, challenges the district court's substantive determination that he was competent to stand trial. We uphold a district court's finding that a defendant is competent to stand trial unless that finding is clearly erroneous. *United States v. Nichols*, 56 F.3d 403, 411 (2d Cir.1995). Where the record on competency may plausibly be read to indicate the defendant may not have been competent, we still "defer to the judgment of the district court, which had the benefit of examining [the defendant] and hearing from the fact and expert witnesses in person." *Id.* at 412. For a defendant to be considered competent to stand trial, the defendant must have "(1) 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and (2) 'a rational as well as factual understanding of the proceedings against him.'" *Id.* at 410 (quoting *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam); *United States v. Hemsi*, 901 F.2d 293, 295 (2d Cir.1990)). This standard determines both competence to stand trial and competence to waive constitutional rights, such as the right to counsel. *See id.* at 413; *Godinez v. Moran*, 509 U.S. 389, 398, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993). The district court is to determine competency based on the preponderance of the evidence. *See Nichols*, 56 F.3d at 410; *see also* 18 U.S.C. § 4241(d) (1994). In determining competency, the court may consider medical opinion as well as its own observation of the defendant's conduct. *See Nichols*, 56 F.3d at 411; *Hemsi*, 901 F.2d at 295.

 Judge Wood's initial finding that Morrison was competent to stand trial and to waive counsel was not clearly erroneous. The FMC report considered by Judge Wood amply supports her finding of Morrison's competence. While it is possible to conclude from the record that Morrison was irrational or delusional at certain points during the trial process, it is just as possible to conclude that Morrison made some apparently false claims in an attempt to further his defense.

We therefore defer to the judgment of the district court. *See Nichols,* 56 F.3d at 412. That the district court's determination was made without a hearing did not render it defective. *See id.* at 414 ("The validity of [the] initial determination of competency is not necessarily undermined by the fact that it was made without the benefit of a hearing."). While the district court found that there was reasonable cause to believe that the defendant might be incompetent before ordering a psychiatric evaluation of him, it found that no reasonable cause existed to hold a hearing once she received the report of that evaluation. The district court therefore did not need to hold a hearing. *See id.* at 414 ("In deciding that an evidentiary hearing is unnecessary, a court may rely not only on psychiatrists' reports indicating competency but also on its own observations of the defendant.").

■■ Morrison also challenges on procedural grounds Judge Wood's May 6, 1996, finding that he was competent to waive counsel. He argues that the district court committed reversible error by allowing him to remain unrepresented at the pre-trial conference in which Judge Wood had Dr. Goldstein present to observe Morrison and offer her expert opinion on his competence. Although Judge Wood had already found Morrison competent and allowed him to waive counsel, she revisited the issues of his competency to stand trial and to waive counsel, and of whether Morrison's waiver of his right to counsel was knowing and voluntary, before allowing him to withdraw his guilty plea. In *United States v. Purnett,* 910 F.2d 51, 56 (2d Cir.1990), we held that if a trial court has cause to doubt the competency of the defendant to make a knowing and intelligent waiver of his right to counsel, it must appoint counsel to serve until the issue with respect to competency is resolved. However, in *Nichols* we declined to extend *Purnett* to require appointment of counsel where, as here, the district court held a hearing as a precautionary measure after making an initial determination of the defendant's competency based on psychiatric reports and the court's own observation. *See Nichols,* 56 F.3d at 414–15. We do not require a trial court to reappoint counsel to a pro se defen-

dant every time it revisits the issue of competency. *See id.* at 415 ("We decline to extend *Purnett* into an automatic adjournment rule every time the district court inquires further into competency."); *Wise v. Bowersox,* 136 F.3d 1197, 1203 (8th Cir.1998) (holding that where defendant was already properly representing himself after a fair determination of his competency, trial court did not err in allowing him to continue to represent himself at a second hearing on his competency).

Morrison argues that the district court applied the wrong standard in determining Morrison's competency, that it inquired only whether he was oriented as to time and place, and remembered certain events, rather than whether he had sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and a rational and factual understanding of the proceedings against him. We find nothing in the record to support Morrison's claim that the district court applied a less stringent standard than required, and therefore we reject it.

**B. Morrison's Motion to Recuse Judge Wood**

■ Morrison argues that Judge Wood should have recused herself under 28 U.S.C. § 455. Morrison moved for recusal on September 18, 1995, stating in his motion that "Judge Wood's husband, Michael Kramer, has an adversarial business and personal relationship with Muhummad Ali ..., Evel Knievel ..., and Arthur Morrison...." Morrison attached an affidavit to his motion alleging that Kramer attempted to establish a business relationship with Morrison, as well as Ali and Knievel, and that the relationship became adversarial because Morrison, Ali, and Knievel declined to allow Kramer access to Ali and Knievel. Morrison alleged that "the circumstances surrounding" Kramer's attempts to report on these subjects included Judge Wood. He also alleged that Kramer called Morrison and Ali in Baghdad, Iraq, in an unsuccessful attempt to secure an interview with Saddam Hussein, all of which fur-

48

ther soured Kramer's relationship with Morrison.[3]

Thereafter, Morrison included Kramer as a proposed defense witness that he wanted to subpoena. Before issuing subpoenas, the court required Morrison to offer the testimony each witness would provide in his defense. Morrison listed Kramer, stating Kramer could "testify as to conversations and [dinner] he had with Muhammad Ali and Ronald Bey" at which Morrison was present. Morrison also claimed that Kramer would testify to learning from New York City Mayor Rudolph Giuliani that Morrison was innocent of the charges in the indictment, and that he had discussed with Mayor Giuliani his intention to secure rights to publish books about Muhammad Ali and Evel Knievel as well as a story about Morrison himself. In an addendum to his list of witnesses, Morrison claimed that Kramer had spoken with Smith Barney representatives, who discussed with Kramer the possibility of dropping the charges against Morrison if Morrison agreed not to sue Smith Barney. Morrison also proposed to call Judge Wood's friend Frank Richardson as a witness in his defense. On May 6, 1996, Judge Wood denied Morrison's motion for recusal, explaining that she had allowed Kramer and Richardson to review the materials submitted by Morrison regarding them and that both credibly stated there was no truth in the allegations and that they had had no contact with Morrison.

▇ A federal judge must recuse herself in any proceeding where her "impartiality might reasonably be questioned," 28 U.S.C. § 455(a) (1994), where the judge "has a personal bias or prejudice concerning a party,"

id. § 455(b)(1), or where she knows that her spouse "has a financial interest in the subject matter of the controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding," id. § 455(b)(4). " 'Since recusal motions are committed to the sound discretion of the district court, . . . the issue on appeal is whether the court abused its discretion.' " United States v. Conte, 99 F.3d 60, 65 (2d Cir.1996) (quoting United States v. Lovaglia, 954 F.2d 811, 815 (2d Cir.1992)).

▇ No abuse of discretion occurred here. While Judge Wood denied Morrison's motion because she found his allegations incredible, at least in part because they were contradicted by the out-of-court statements of Kramer and Richardson, we affirm her decision because Morrison makes no claim that would warrant recusal in any event.[4] In the recusal motion itself, Morrison alleges no interest of Kramer that would cause a reasonable person to question Judge Wood's impartiality. " '[W]here an interest is not direct, but is remote, contingent, or speculative, it is not the kind of interest which reasonably brings into question a judge's impartiality.' " United States v. El–Gabrowny, 844 F.Supp. 955, 961 (S.D.N.Y.1994) (quoting In re Drexel Burnham Lambert, Inc., 861 F.2d 1307, 1313 (2d Cir.1988)). Even if it were true that Kramer had developed a poor relationship with Morrison because Morrison had frustrated his pursuit of certain writing and publishing projects, it requires too much speculation to convert Kramer's alleged past frustrated dealings with Morrison into any interest, financial or otherwise, in the out-

3. We note that Morrison offered evidence, for the purpose of his bail determination, that he did hold a long-time association with Muhammad Ali, Evel Knievel, and other prominent figures, he was president of Champion World Brands, which at one point entailed negotiation with the K–Mart corporation, and he did play an important role in negotiations to free hostages held in Iraq.

4. We do wish to note, however, that it was not irregular for Judge Wood to ascertain her husband's and friend's possible involvement with the defendant simply by asking them, in a reasonable effort to confirm that Morrison's incredible claims were indeed not factual. See 28 U.S.C. § 455(c) ("A judge should inform [her]self about

[her] personal and fiduciary financial interests, and make a reasonable effort to inform [her]self about the personal financial interests of [her] spouse...."); Williams v. Balcor Pension Investors, No. 90 C 0726, 1990 WL 205805, at *8, nn.7 & 9 (N.D.Ill. Nov.28, 1990) (Rovner, J.) ("The Court has discussed this matter with her husband, and confirmed that his pension fund has not purchased any interest in any of the Mortgage Funds at issue in this case.... The Court wishes to note that it has not discussed with her husband or son what opinions they may in fact hold with respect to ... any ... party to this case, nor does the Court make it a practice to discuss such matters with her family.").

come of Morrison's unrelated criminal trial. *See Drexel Burnham Lambert*, 861 F.2d at 1314–15; *Union Planters Bank v. L & J Dev. Co.*, 115 F.3d 378, 383 (6th Cir.1997) (holding that possibility that judge's wife owned stock in bank that acquired one of the parties to the suit did not require recusal).

Nor did Morrison's requests to call both Kramer and Richardson as witnesses create a duty in Judge Wood to recuse herself, because Morrison failed to offer any basis for believing that any testimony they would provide would have been relevant to his case, and not hearsay or legal conclusion. Morrison alleged, for example, "Ronald Bey has ... stated ... that in a telephone call Mr. Kramer said to him, he had conversation with Mr. Rudolph Giuliani, in which he learned that the defendant was innocent of charges in the indictment and Mr. Kramer asked if the defendant could assist in securing the RIGHTS for Mr. Kramer to do the autobiographies of Muhammad Ali and Evel Knievel" and that if the defendant helped him to do so, Kramer would write a book about the defendant's own plight. On April 18, 1996, Morrison sent a letter to Judge Wood in which he claimed, without stating the basis for his knowledge, that Kramer had spoken to Smith Barney, which offered to drop the charges against him. Such allegations would not have constituted evidence in Morrison's defense.

Morrison also asserts on appeal that Judge Wood committed reversible error by contacting Kramer and Richardson because she "thus received *ex parte* information regarding disputed evidentiary facts (namely the credibility of witnesses)." Morrison provides no basis whatsoever for his claim that Judge Wood received any information besides what she already knew about Kramer's and Richardson's lack of contact with the defendant. As Judge Wood stated on the record, she knew that neither Kramer nor Richardson had useful information for Morrison, and asked them only to confirm what she knew. *See Sine v. Local No. 992 Int'l Bhd. of Teamsters*, 882 F.2d 913, 915 (4th Cir.1989) (finding no requirement to recuse

for bias where trial judge received ex parte letter regarding one of the parties that did not contain any information the judge did not already know).

Morrison adds a claim that the district court erred by refusing to allow Morrison to refresh the recollection of his witnesses by showing them a photograph of Kramer or to question them in front of the jury regarding contacts with Kramer. Morrison makes no allegation regarding Kramer that would have been relevant to his defense, so we find no error in the district court's exclusion of testimony regarding Kramer. *See, e.g., United States v. Scopo*, 861 F.2d 339, 345 (2d Cir.1988) ("[T]he trial judge has wide discretion to exclude proffered evidence that is collateral, rather than material, to the issues in the case.").

### C. The Sufficiency of the Evidence

Morrison challenges the sufficiency of the evidence for each count for which he was convicted. Morrison carries a heavy burden in making this claim, and we must consider the evidence "in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government, and [we] may overturn the conviction only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Hernandez*, 85 F.3d 1023, 1030 (2d Cir.1996). We defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence. *See United States v. Matthews*, 20 F.3d 538, 548 (2d Cir.1994). Proof of the elements of the crimes charged may be entirely by circumstantial evidence. *See United States v. Sureff*, 15 F.3d 225, 228 (2d Cir.1994).

Only with respect to Counts Eleven, Twelve, and Thirteen, corresponding to Morrison's calls to Nathaniel Cochrane, from California to New York, between August and October 1989, is Morrison's claim of insufficient evidence even colorable, yet we find he has not met his burden.[5] The evidence es-

**5.** Morrison sends us a "letter-affidavit" ad- dressed to his attorney in which he objects to an

tablished that Morrison made at least three threatening interstate telephone calls to Mr. Cochrane, as charged. Morrison did not dispute that Mr. Cochrane lived in the Bronx, New York, and that Dr. Cochrane and Morrison lived together in California before they broke up in 1989. Mr. Cochrane testified that Morrison called him shortly after the two broke up; while Morrison at first inquired only about where Dr. Cochrane was, Morrison later made statements threatening that he would disfigure Dr. Cochrane or have someone else do so. Cochrane testified that Morrison repeated this threat approximately four times between August and October 1989. Although Mr. Cochrane testified that in at least one of the threatening calls Morrison was calling from New York, he also testified that he received at least three other threatening calls during that period, and that in some of these calls Morrison told Cochrane that he was calling from L.A. Morrison also told Mr. Cochrane that he wanted Dr. Cochrane to leave California and go back to New York, so that "he can save face among his friends in California," suggesting that Morrison was still in California.

The jury certainly may have concluded that Morrison was outside of New York during this period also from Morrison's own incredible testimony regarding his whereabouts when he called Mr. Cochrane. *See United States v. Friedman,* 998 F.2d 53, 57 (2d Cir.1993) (where defendant's exculpatory testimony was not credible, the "jury was entitled to conclude that [defendant's] version of the events was false and thereby infer his guilt"). Morrison testified that he returned to New York by driving himself, even though he had broken both of his feet, before calling Mr. Cochrane. Morrison also claimed that he saw two acquaintances in New York "at least three or four times per week."

Neither of these acquaintances, Reynold Francis and Sonny Allen, corroborated this claim. Allen could not recall whether he saw Morrison in New York at all during that period, and Francis testified that he saw Morrison a total of nine or ten times during the three months. The jury was entitled to assess the credibility of Morrison and his witnesses regarding his presence in New York during the relevant period, and to conclude that the testimony was fabricated, so that the opposite was true.[6] *See id.* We are not at liberty to disturb the inferences drawn by the jury, especially with respect to credibility.

We have considered Morrison's claims that the Government offered insufficient evidence to establish that the calls alleged in the other counts occurred over state lines, and we reject them as utterly without merit.

**D. Morrison's Sentence**

The district court held an evidentiary hearing on December 18, 1996, on the Government's motion for upward departure. The Government called as its witness Dr. Helen Newton, a friend and colleague of Cochrane. Newton testified that Morrison called her as often as twenty or thirty times a day, at home and at work, for a period of approximately six or seven months after he and Cochrane broke up. Newton testified that in some of the calls, Morrison would threaten to hurt Dr. Cochrane if he ever found that she was seeing someone else. Newton also testified that Morrison threatened that Newton's fourteen-year-old son would be in danger if she did not reveal Cochrane's whereabouts to him. Newton testified that these phone calls made her fear both for herself and her son. On March 31, 1997, the hearing continued, and the Government called Jose Diaz, an inmate at the prison where Morrison was

apparent concession by his attorney at oral argument that Morrison stated to Mr. Cochrane he was calling from California. Morrison claims that Mr. Cochrane testified only that Morrison stated he was calling from "L.A.", which does not necessarily mean Los Angeles. We note that we have not considered it conceded by the defense that any of the calls came from Los Angeles, California, but nevertheless find sufficient evidence to establish that each of the charged calls came from outside New York.

6. Judge Wood found Morrison's testimony to be so clearly incredible that she formally found "that his carefully tailored account of his continuous presence in New York in the summer of 1989 [to have been] nothing more than a series of lies intended to avoid the interstate nexus element of 18 U.S.Code Section 875(c), . . . contradicted by the record and . . . perjurious."

held. Diaz testified that Morrison told him that in retaliation for Judge Wood's initial denial of his motions to withdraw his guilty plea and dismiss the indictment against him, Morrison planned to attempt to subpoena Michael Kramer in an attempt to force Judge Wood to recuse herself. Diaz testified that Morrison said that he would falsely claim to have had some business with Kramer as the basis for calling Kramer as a witness. The court refused Morrison's request to require Morrison's victims to testify at the sentencing hearing, because the court doubted such further examination would be helpful to Morrison, because testifying again would be extremely painful to the victims, and because Morrison had already cross-examined the testifying victims regarding the psychological injury he had caused.

The district court made substantial upward departures from the Sentencing Guideline range for the crimes for which Morrison was convicted. To a base offense level of 12, as required by U.S.S.G. § 2A6.1, for the threatening communications counts, the court added a six-level enhancement under § 2A6.1(b)(1), because Morrison's conduct showed an intent to carry out his threats. The court granted the Government's request for a two-point adjustment for Morrison's obstruction of justice, on two independent grounds, perjury and fabricating connections to the judge's husband in an effort to force her recusal. The court also made departures under §§ 5K2.3 and 5K2.8 for extreme conduct and extreme psychological injury to Morrison's victims. The court noted, "Each of the victims was exceptionally credible and testified clearly and carefully about defendant's threatening and harassing conduct towards them. The court saw in their demeanor the extreme pain, the extreme anxiety and the terror that behavior has caused them in the past, still causes them, and, they legitimately fear, will cause them in the future." The court granted an upward departure of three points for the extreme conduct and extreme psychological injury inflicted upon Cheryl Cochrane, three points for the extreme psychological injury inflicted upon Marianne Spraggins, two points for the extreme psychological injury inflicted upon Lauren Gumes, one point each for Morrison's

extreme conduct toward Nathaniel Cochrane, Gussie Cochrane, Helen Newton, the Dominguez Hills Medical Center, and the American Board of Emergency Medicine, and one half-point each for Morrison's extreme conduct toward Patricia Nowak and Smith Barney. Morrison's convictions, grouped according to U.S.S.G. § 3D1.4(b), would have constituted an offense level of 22. The court's two-level departure for obstruction of justice, plus its departures totaling fourteen levels for extreme conduct and extreme psychological injury, achieved a total offense level of 38. With a Criminal History category of II, this offense level dictated a sentence of 262 to 327 months. While the court stated it would be appropriate to sentence Morrison at the high end of the range, the court chose three hundred months, slightly above the midpoint, in light of Morrison's age.

Morrison raises numerous challenges to his sentence. Morrison challenges the district court's decision to depart upward from the Sentencing Guidelines range by six levels for conduct evidencing an intent to carry out his threats, under U.S.S.G. § 2A6.1(b)(1), claiming no evidence existed that he intended to carry out his threats, and that the district court improperly considered evidence of events before the threats were made as such evidence. Morrison challenges the district court's upward departure of two levels for obstruction of justice, claiming that evidence was insufficient to find that Morrison committed perjury. Morrison also challenges the district court's upward departures on the grounds that the conduct was extreme and caused extreme psychological injury under U.S.S.G. §§ 5K2.8, 5K2.3, claiming that the district court improperly considered effects both on Morrison's victims and on "secondary victims," others who were affected by Morrison's conduct. Morrison argues that the effects on the victims were not unusual, that the district court erred in departing based on the same evidence that supported Morrison's conviction, and that the district court erred in considering Morrison's own conduct at trial in assessing the extremeness of the conduct, as an infringement of his right to conduct his own defense. Morrison further claims that the district court should

have conducted a more extensive hearing in determining the sentence, and that the sentence he received constitutes vindictiveness on the part of the prosecution for his withdrawal of his guilty plea. We reject each of these claims.

On appeal of a sentence, we accept the district court's findings of fact unless they are clearly erroneous. *United States v. Molina*, 106 F.3d 1118, 1121 (2d Cir.1997), *cert. denied,* —— U.S. ——, 117 S.Ct. 1859, 137 L.Ed.2d 1060 (1997). Furthermore, we do not overturn the district court's application of the Sentencing Guidelines to the facts absent an abuse of discretion. *United States v. Phipps*, 29 F.3d 54, 56 (2d Cir.1994). We grant particular deference to the district court when its factual findings are based upon the court's observation of testimony. *United States v. Beverly*, 5 F.3d 633, 642 (2d Cir.1993).

We find no error in the district court's imposition of the six-level enhancement for conduct demonstrating an intent to carry out threats, under § 2A6.1(b)(1). It is true that in order to invoke this section, "the conduct proffered as probative of such an intent must have occurred 'either contemporaneously with or after the threat.'" *United States v. Kirsh*, 54 F.3d 1062, 1073 (2d Cir. 1995) (quoting *United States v. Hornick*, 942 F.2d 105, 108 (2d Cir.1991)). The district court imposed the six-point enhancement for conduct evidencing an intent to carry out threats with respect to Morrison's conduct charged in Count Six, in his threats to Marianne Spraggins, Counts Eleven, Twelve, and Thirteen, involving threats toward Cheryl Cochrane, and Count Fifteen, in his threats to Lauren Gumes. As conduct evidencing an intent to carry out threats made to Spraggins, the district court noted the repeated telephone calls to Spraggins and calls to the chief executive officer of Smith Barney, with threats to him. These calls took place after the phone calls in December 1991 for which Morrison was convicted, when he threatened to break Spraggins's legs and neck, and sufficed to support the upward departure. Judge Wood did cite Morrison's punching of Lauren Gumes's leg the evening they were in Las Vegas as evidence of intent to carry out

his subsequent threat to her; Gumes returned to New York to find a threatening message on her machine the next day. However, the court also relied on Morrison's repeated phone calls to Gumes, all of which occurred after the threat for which he was convicted, and which were sufficient to support the enhancement. With respect to Counts Eleven through Thirteen, charging Morrison's threats to Nathaniel Cochrane that he would hurt or destroy Cheryl Cochrane, the court noted a great deal of conduct showing an intent to carry out the threat, including calling family members, making a bomb threat to her employer, distributing derogatory materials about her to her employer and to the Board of Emergency Medicine, and breaking into her apartment. While the bomb threat to the hospital and the break-in of Cochrane's apartment occurred before Morrison's calls to Mr. Cochrane, the post-threat conduct sufficiently supports Judge Wood's departure. We may affirm a ruling regarding the Guidelines "where a district court articulates permissible as well as impermissible reasons." *United States v. Cousineau*, 929 F.2d 64, 69 (2d Cir.1991).

Morrison's challenge to his sentence enhancement for perjury fails as well. A sentencing enhancement for obstruction of justice is warranted when a defendant testifying under oath "gives false testimony concerning a material matter with the willful intent to provide false testimony." *United States v. Dunnigan*, 507 U.S. 87, 94, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993). Judge Wood noted numerous inconsistencies in the record and made her own assessment of Morrison's credibility by observing his testimony at trial; she cited more than adequate support for her finding that Morrison deliberately lied about material issues in an attempt to affect the outcome of the trial. We find no clear error in the district court's findings in support of the enhancement for obstructing justice.

We find that the district court's fourteen level upward departure on the basis of extreme conduct and extreme psychological injury, under U.S.S.G. §§ 5K2.3 and

5K2.8, also to be devoid of error. A sentencing court "has 'wide discretion' ... in determining whether aggravating circumstances exist to support an upward departure." *United States v. Stephens,* 7 F.3d 285, 289 (2d Cir.1993) (quoting *United States v. Palta,* 880 F.2d 636, 639 (2d Cir.1989)). The district court based its findings of extreme behavior and extreme psychological injury in large part upon its observation of the "extreme pain, anxiety and terror [of victims who] testified at trial." The Guidelines permit an upward departure on the ground of extreme psychological injury when the injury was "much more serious than that normally resulting from commission of the offense;" for example, "when there is a substantial impairment of the intellectual, psychological, emotional, or behavioral functioning of a victim, when the impairment is likely to be of an extended or continuous duration, and when the impairment manifests itself by physical or psychological symptoms or by changes in behavior patterns." U.S.S.G. § 5K2.3 p.s. Where "the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim, the court may increase the sentence above the guideline range to reflect the nature of the conduct. Examples of extreme conduct include torture of a victim, gratuitous infliction of injury, or prolonging of pain or humiliation." *Id.* § 5K2.8 p.s. To qualify as extreme, the conduct must contain "'an aggravating ... circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission'" in formulating the Sentencing Guidelines. *United States v. Fan,* 36 F.3d 240, 245 (2d Cir.1994) (quoting 18 U.S.C. § 3553(b) (1994)). Morrison claims that the district court erred in its departures for extreme psychological injury and extreme conduct because his conduct was within the contemplation of the Sentencing Commission for the crimes for which he was convicted, and because the injury to his victims was not unusual.

The district court articulated factual details or circumstances in support of its determinations that the psychological injury to Morrison's victims exceeded what would normally be expected for the crimes charged, and that Morrison's conduct was extreme. Regarding Cheryl Cochrane, the court made specific findings that Morrison not only threatened her, but threatened her as part of a plan to destroy her, forcing her to isolate herself from friends and family and jeopardizing her career, requiring her to change homes and jobs, causing her to consider leaving the country, and significantly changing her personality, making her suspicious and extremely reclusive. With respect to Spraggins, the court noted how Morrison's conduct pervaded Spraggins's life, causing her to experience terror over an extended course of time, and causing her to change her behavior patterns, for example, by taking steps to buy a gun. The court noted, regarding Lauren Gumes, that her testimony that she felt Morrison would "stop at nothing to get" her was highly credible, that she demonstrated great fear, and that she endured Morrison's terrifying conduct for a full year. The court based its departure for Morrison's extreme conduct toward Nathaniel Cochrane on the prolonged period, three years, in which Cochrane endured calls from Morrison, and the "particularly cruel and heinous," nature of Morrison's threats to disfigure Dr. Cochrane and ruin her career, which forced Mr. Cochrane to discontinue his own contact with his daughter. In departing for Morrison's threats to Helen Newton, the court noted the especially cruel and heinous threats Morrison made toward Newton's son, and Morrison's complaint to Newton's employer that she had molested a child patient. The court noted, in making its departure for Morrison's extreme conduct toward Gussie Cochrane, the extreme fear Morrison's threats caused her, particularly his threat that she would not recognize her daughter after he beat her face, and the fact that Morrison's threats caused Dr. Cochrane to miss her grandfather's funeral. The court noted that Morrison's bomb threat to the ABEM caused cancellation of a national examination, affecting thousands of doctors, that Morrison's threatening call to Detective Patricia Nowak included sexually threatening comments to a police officer and a threat to blow up the police department, and that Morrison's threats to Smith Barney included a threat to destroy the firm by contacting national media and all of the nation's black mayors.

We find no error in the district court's assessment of the nature and duration of Morrison's threats, as well as the demeanor of the testifying victims, to find the seriousness of his offenses and the effects on his victims greater than that anticipated by the drafters of the Sentencing Guidelines. The departures for Morrison's victims are squarely consistent with our precedent in similar cases. *See United States v. Miller*, 993 F.2d 16, 21 (2d Cir.1993) (affirming district court's upward departure under § 5K2.3 based on psychological injury sustained by the victim in a threatening communications case where victim's testimony indicated extreme, pervasive fear that caused the victim to want to leave the city where she lived, and made her afraid to answer the telephone or to open her mail for three years as a result of defendant's campaign of harassment); *United States v. Pergola*, 930 F.2d 216, 218, 219 (2d Cir.1991) (affirming district court's upward departure under §§ 5K2.3 and 5K2.8, resulting in maximum sentence where persistent threats by defendant resulted in victim living in constant fear and being unable to sleep or form close relationships). We also agree that Morrison's bomb threats, given the particular establishments threatened, a hospital emergency room and a police department, and the effects of those threats, constitute extreme behavior. Causing cancellation of a national exam affecting thousands of doctors was extreme. We find no clear error in the district court's finding of facts at trial, and no abuse of discretion in her application of those facts to sections 5K2.3 and 5K2.8. We also find the size of the district court's departures to be reasonable, and that the reasons given by the district court justify the magnitude of each departure. *See United States v. Campbell*, 967 F.2d 20, 26 (2d Cir.1992).

Nor do we find error in the district court's decision to consider effects on "secondary victims." The court considered Morrison's threats to secondary victims to be "part and parcel" of his threats to primary victims, and we agree. In the case on which Morrison relies, *United States v. Hoyungowa*, 930 F.2d 744, 747 (9th Cir.1991), the Ninth Circuit reversed an upward departure based on effects on a victim's family who neither witnessed the perpetrators commit the crime nor had direct contact with them. It does not apply to this case because all of the victims the district court considered in rendering Morrison's sentence did have direct contact with Morrison. *See United States v. Haggard*, 41 F.3d 1320, 1326–27 (9th Cir.1994) (finding family of kidnaping victim to be "victim" of defendant's crimes within meaning of Sentencing Guidelines for upward departure).

We reject Morrison's claim that the district court infringed his right to represent himself by considering in its sentencing determination its observation of Morrison's conduct while representing himself as well as his conduct as a defendant. We find no reason to believe the court did consider Morrison's conduct while representing himself in making its departures. Morrison cites the district court's statement that Morrison "showed particular skill at sadistically picking at painful wounds" his victims bore as evidence that she considered his conduct examining witnesses in his sentencing. This statement by the court was not given as a reason for any of the court's upward departures, however, but only as one reason she was denying Morrison the opportunity to re-examine the victims of his crimes. We therefore need not decide whether the court could permissibly have taken Morrison's conduct in examining witnesses into consideration in sentencing him.

The district court was not required to grant the defendant's request for a hearing at which to cross-examine his victims in order to show that their psychological injury was less than appeared at trial, nor was it required to order the victims to undergo an examination by a mental health professional. A criminal defendant has no right to demand an evidentiary hearing to present his own witnesses at sentencing. *See United States v. Pugliese*, 805 F.2d 1117, 1123 (2d Cir.1986). We have affirmed numerous upward departures in similar cases where the district court rendered its decision based only on trial testimony and not on expert testimony. *See Miller*, 993 F.2d at 21; *Pergola*, 930 F.2d at 219. A sentencing court

does not need to hear the testimony of psychologists or psychiatrists to impose an upward departure based on psychological injury. *See United States v. Passmore*, 984 F.2d 933, 936 (8th Cir.1993).

Finally, Morrison claims that his sentence was the product of prosecutorial vindictiveness, and that the Government made an implied promise to him when he withdrew his guilty plea that his sentence would have been in the range of forty-one to fifty-one months. Morrison claims he is entitled to a presumption of vindictiveness, *see North Carolina v. Pearce*, 395 U.S. 711, 726, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), because he received a substantially longer sentence after exercising his legal right to move to withdraw his plea. In *Alabama v. Smith*, 490 U.S. 794, 803, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989), the Court held that no presumption of vindictiveness arises when a defendant succeeds in having his guilty plea vacated, and then receives a higher sentence after trial. Because Morrison thus has no basis to claim a presumption of prosecutorial vindictiveness, he must present evidence of actual vindictiveness, which he has not done. As for Morrison's claim that the Government or the district court promised a certain sentence to him if he withdrew his guilty plea, we find no such promise, either implied or express. As the district court ruled below, the record makes it clear that the Government's representations about Morrison's likely sentence were clearly estimates, not promises.

**E. Other Claims**

Morrison presents a number of other claims: that he received ineffective assistance of counsel, that his pre-trial motions to dismiss the indictment were improperly denied, and that the district court should have excluded from evidence tapes of telephone conversations recorded by Morrison's victims. None of Morrison's arguments have merit.

Morrison claims that his standby counsel ineffectively assisted him. We have held that "there is no constitutional right to hybrid representation ... where [the defendant] shared the duties of conducting her

defense with a lawyer." *United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir.1997), *cert. denied*, — U.S. ——, 118 S.Ct. 130, 139 L.Ed.2d 80 (1997). As we held in *Schmidt*, without a constitutional right to standby counsel, a defendant is not entitled to relief for the ineffectiveness of standby counsel. *Id.* While we stated in *Schmidt* that we might entertain a claim for ineffective assistance of standby counsel if standby counsel "held that title in name only and, in fact, acted as the defendant's lawyer throughout the proceedings," *id.*, the record indicates that Morrison retained control of his own defense throughout the proceedings, so that his standby counsel was in reality, as well as in name, only that. Therefore, we need not examine the effectiveness of Dunn's standby assistance.

Morrison makes three arguments finding error in the district court's refusal to dismiss the indictment against him. He argues first that the grand jury was presented with perjured testimony and with altered tape recordings. Both the testimony to which Morrison refers and the tapes were presented to the jury at trial, and the jury convicted Morrison on the relevant counts. The jury's verdict of guilty against Morrison rendered harmless any error resulting from the evidence used to indict him. *See United States v. Mechanik*, 475 U.S. 66, 72–73, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986); *United States v. Ruggiero*, 934 F.2d 440, 447–48 (2d Cir.1991) (rejecting challenge to indictment based on alleged exaggeration by prosecution regarding content of tapes to grand jury, since "any possibility of prejudice was eliminated by the petit jury's conviction ... after hearing the tapes in their entirety").

Second, Morrison argues that material relevant to his defense was destroyed by the Government, in violation of *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and that his motion to dismiss the indictment was thus wrongly denied. He claims that tapes made of his telephone conversations while he was incarcerated at the Metropolitan Correctional Center and Federal Correctional Institution at Otisville [the "MCC tapes"], pursuant to

prison policy, contained exculpatory evidence and were destroyed by the Government. The district court had ordered certain tapes preserved based on Morrison's assertion that the tapes contained information that would support his motion to withdraw his plea of guilty. However, the district court rescinded that order on November 18, 1994, finding that no relevant information was contained on the tapes, based on sworn testimony from Morrison regarding the tapes' contents. After the tapes were destroyed, Morrison moved the court to dismiss his indictment, claiming for the first time that the tapes contained exculpatory material. A conviction should be reversed as a result of withheld exculpatory evidence "if the omitted evidence creates a reasonable doubt that did not otherwise exist." *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). We give deference to a trial court's rulings with respect to destruction of material claimed to be exculpatory because it is better able to determine the effect the exculpatory materials would have had on the outcome. *See United States v. Petrillo*, 821 F.2d 85, 88 (2d Cir.1987). Given that Morrison had been given an opportunity to testify regarding the contents of the tapes and failed to state any information relevant to his defense, and given, as the district court noted, "that [Morrison] previously stated that the information on the tapes was material to the withdrawal of his guilty plea," and that "[h]e has now changed his tack and asserts that the information is exculpatory," we do not find error in the district court's judgment that the tapes did not contain exculpatory material.

 Morrison's third argument that his motion to dismiss the indictment was wrongly denied is based on the officers who arrested him taking him before a United States Magistrate Judge in the Southern District of New York, even though he was arrested in Newark, New Jersey. Rules 5(a) and 40(a) of the Federal Rules of Criminal Procedure both require that anyone arrested in a district other than that in which the offense was allegedly committed be taken "without unnecessary delay before the nearest available federal magistrate judge." Fed.R.Crim.P. 5(a), 40(a). We have held that where delay is not used to subject defendant to unwarranted interrogation, no prejudice results, and violation of Rule 5(a) does not warrant reversal. *See United States v. Grandi*, 424 F.2d 399, 402–03 (2d Cir.1970). The Government offered no post-arrest statements into evidence that could have been the result of any improper interrogation; we therefore find no prejudice Morrison could have incurred from any possible violation of Rules 5(a) and 40(a).

 Morrison makes various arguments regarding the admission at trial of tapes of his communications. Morrison claims that tapes made of calls to Smith Barney were not properly authenticated, and that a tape made of Morrison's call to the Dominguez Hills Medical Center was inadmissible because, he claims, the tape was made against California law. The tapes of calls to Smith Barney were adequately authenticated before being admitted into evidence. Rule 901(a) of the Federal Rules of Evidence provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901(a). "Recognizing ... that 'recorded evidence is likely to have a strong impression upon a jury and is susceptible to alteration,'" we require clear and convincing evidence of authenticity for admission of recordings. *United States v. Ruggiero*, 928 F.2d 1289, 1303 (2d Cir.1991) (quoting *United States v. Fuentes*, 563 F.2d 527, 532 (2d Cir.1977)). We review a district court's rulings with respect to sufficiency of evidence of authenticity for abuse of discretion. *Id.* Morrison claims the tapes were edited or altered, and he called an expert to testify at trial that there were anomalies, edits, and pauses on three of the tapes. The Government rebutted with an expert who testified that nothing on the tapes indicated tampering. The contents of the conversations on the challenged tapes are coherent and flow logically, making it improbable that any material was deleted or added. We find that the Government presented sufficient evidence to support the authenticity of the tapes and that the district court committed no abuse of discretion by admitting them. *See*

*United States v. Sovie*, 122 F.3d 122, 127 (2d Cir.1997). We also reject Morrison's challenge regarding the chain of custody of the tapes. Breaks in the chain of custody do not bear upon the admissibility of evidence, only the weight of the evidence, and therefore do not provide us any basis for reversal. *See Ruggiero*, 928 F.2d at 1304.

The tape-recorded conversation of Morrison's conversation with James Spinelli of Dominguez Hills Medical Center was also properly admitted. Morrison claims that the recording violated California law. We need not decide whether it violated California law for Spinelli to record Morrison's call without Morrison's consent, because federal law governs the admissibility of evidence in a federal criminal trial. "[E]vidence admissible under federal law cannot be excluded because it would be inadmissible under state law." *United States v. Pforzheimer*, 826 F.2d 200, 204 (2d Cir.1987) (quoting *United States v. Quinones*, 758 F.2d 40, 43 (1st Cir.1985)). It is not unlawful under federal law for a person not acting under color of law to intercept a wire, oral or electronic communication where such person is a party to the communication. *See* 18 U.S.C. § 2511(2)(d) (1994). Therefore, Spinelli's recording of Morrison's call to the Dominguez Hills Medical Center was lawful under federal law and admissible in Morrison's federal prosecution without regard to whether it was made in violation of California law or would have been admissible in a California court. *See United States v. DiFelice*, 837 F.Supp. 81, 82 (S.D.N.Y.1993) (finding that victim's recording of telephone conversations with defendant was admissible in federal criminal prosecution even though taping might have violated Massachusetts law). We also find that the Government established the appropriate foundation for admitting the tape as a copy.

Morrison argues that the tape of his conversation with Spinelli was not relevant and was more prejudicial than probative, so that it violated Federal Rules of Evidence 402 and 403. We find that the district court properly admitted the tape under Rule 404(b), in that it gave evidence of Morrison's knowledge, intent,[7] and plan to threaten, harass and terrify Dr. Cochrane and the "absence of mistake or accident" in Morrison's victim's perception of his threats. Evidence of prior criminal conduct is admissible under Rules 404(b) of the Federal Rules of Evidence if the evidence is relevant to an issue at trial other than the defendant's character, and if the probative value of the evidence is not substantially outweighed by the risk of unfair prejudice. *See Huddleston v. United States*, 485 U.S. 681, 685–86, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988); *United States v. Jaswal*, 47 F.3d 539, 544 (2d Cir. 1995) (per curiam). We review a district court's determination whether to admit similar act evidence for abuse of discretion. *See United States v. Aminy*, 15 F.3d 258, 260 (2d Cir.1994). Morrison had attempted to show at trial that his communications had not been threatening, and that he had not intended them as such, for instance, that he had called Nathaniel Cochrane only in a friendly, good-faith effort to reunite with his former girlfriend Cheryl Cochrane. The court instructed the jury that it could not consider the evidence of the hospital bomb threat as a substitute for proof that the defendant committed the crimes charged, only that it may, but did not have to, "draw an inference that in making threatening communications regarding Dr. Cheryl Cochrane, the defendant acted knowingly and intentionally and as part of a plan, and not because of some mistake, accident or other innocent reason." The district court did not abuse its discretion in ruling that the tape was more probative than prejudicial.

## IV. Conclusion.

For the above reasons, we affirm.

---

7. The district court instructed the jury that in order to find the defendant guilty of threatening communications, they must find that he made the communications "knowingly, wilfully and with the intent to communicate a threat to injure." It is not at issue in this appeal, and we express no opinion here, whether under 18 U.S.C. § 875(c) the Government is required to prove the defendant's subjective intent, or whether it is sufficient that the defendant knowingly transmitted communications that were objectively threatening.