**UNITED STATES of America**

v.

**Robert Allen STANFORD.**

**Criminal Action No. H–09–342.**

United States District Court, S.D. Texas, Houston Division.

May 10, 2012.

Gregg Jeffrey Costa, Office of the United States Attorney, Houston, TX, William J. Stellmach, Andrew Howard Warren, United States Department of Justice, Washington, DC, for United States of America.

Robert A. Scardino, Jr., Ali R. Fazel, Scardino & Fazel, Houston, TX, for Defendant Robert Allen Stanford.

## MEMORANDUM OPINION DETERMINING COMPETENCY

DAVID HITTNER, District Judge.

On December 22, 2011, after a two-and-a-half day competency hearing, this Court issued an Order of Competency finding Defendant Robert Allen Stanford competent to stand trial. *See* Order of Competency, *United States v. Stanford,* No. 09–342 (S.D.Tex. Dec. 22, 2011), ECF No. 560. The Court's Order stated that a more thorough order outlining the Court's detailed findings would be forthcoming at a later date. Since then, the Court has also had the benefit of observing Mr. Stanford during a seven-week jury trial that commenced on January 23, 2012.

The Court now issues this Memorandum Opinion, detailing its findings in support of its December 2011 Order of Competency. The Court's findings are based on a review of medical reports submitted by both the Bureau of Prisons Federal Medical Center in Butner, North Carolina and defense-retained doctors, in addition to testimony, exhibits, and oral arguments presented during the December 2011 competency hearing. This Memorandum Opinion also documents the Court's observations of Stanford during the subsequent jury trial, which further confirm the Court's prior ruling that Stanford was able to effectively assist his counsel and understand the criminal proceedings.

## I. BACKGROUND

On January 6, 2011, the Court held an initial hearing to determine Stanford's competency to stand trial under the Insanity Defense Reform Act of 1984, 18 U.S.C. § 4241 *et seq.* Three psychiatrists testified at the initial hearing, and all agreed that Stanford was, at that time, unable to effectively and rationally assist his attorneys in developing a defense based upon Stanford's diminished mental capacity, which had occurred as a result of one or a combination of the following: (1) overmedication, which had led to an addiction; (2) potential brain damage caused by a head injury sustained in September 2009; or (3) Major Depressive Disorder. The evidence presented at the initial hearing focused on Stanford's cognitive functioning, difficulty concentrating, and fatigue.[1] There was no evidence or allegation presented concerning extensive retrograde amnesia, a condition that Stanford would later claim.

On January 26, 2011, after considering the evidence and arguments presented at the initial hearing, the Court found Stanford to be incompetent to stand trial based on his apparent impaired ability to rationally assist his attorneys in preparing his defense. *See* Order for Psychiatric Evaluation at 11, *United States v. Stanford,* No. 09–342 (S.D.Tex. Jan. 26, 2011), ECF No. 402. Consequently, the Court ordered Stanford to be committed to the custody of the Attorney General to undergo medical treatment as required by 18 U.S.C. § 4241. *See id.* at 11–12.

On February 18, 2011, Stanford was admitted to the Bureau of Prisons Federal Medical Center in Butner, North Carolina ("Butner"), a suitable treatment facility as defined by 18 U.S.C. § 4247(a)(2). On November 4, 2011, following eight months of psychological evaluation and treatment, Butner's Mental Health Department found Stanford competent to stand trial and therefore discharged him from Butner. On December 20, 2011, the Court held a

---

1. At the hearing, Dr. Victor R. Scarano—a defense-retained forensic psychiatrist—testified that Stanford's working memory had decreased but that tests revealed Stanford's memory to be above average. *See* Transcript of Competency Hearing at 49, 77, *United States v. Stanford,* No. 09–342 (S.D.Tex. Jan. 6, 2011), ECF No. 414.

second hearing pursuant to 18 U.S.C. § 4241(e) to determine whether Stanford had regained competence consistent with Butner's findings. For three days—December 20 through 22—the Court heard evidence and argument concerning Butner's forensic evaluation, as well as independent evaluations performed by various defense-retained doctors. On December 22, 2011, the Court declared Stanford competent to stand trial. *See* Order of Competency. This Memorandum Opinion provides the detailed findings supporting the Court's December 2011 Order of Competency.

## II. STANDARD OF REVIEW

█ As articulated in the Court's January 2011 Order for Psychiatric Evaluation finding Stanford incompetent at that time, the standard for determining competency is whether a preponderance of the evidence establishes that the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam); *see also United States v. Dockins*, 986 F.2d 888, 892 (5th Cir.1993) (stating that the Government bears the burden of establishing a defendant's competence by a preponderance of the evidence). At the initial January 2011 competency hearing, none of the testifying doctors opined that Stanford was unable to understand the proceedings against him. In fact, eleven months later, during the second December 2011 competency hearing, defense-retained doctors Victor R. Scarano, M.D., J.D. (a forensic psychiatrist) and Larry Pollock, Ph.D. (a neuropsychologist) agreed that Stanford understood the criminal proceedings. *See* Transcript of Hearing Vol. 1 at 280 (Dr. Pollock stating that Stanford "understands the proceedings");[2] Transcript of Hearing Vol. 2 at 169 (Dr. Scarano stating that Stanford understands the proceedings); *see also* Ralph B. Lilly, M.D., Evaluation Report at 5 (December 11, 2011) (hereinafter, "Lilly Report") (opining that Stanford is incapable only of assisting counsel).[3] Thus, the primary issue in dispute at the December 2011 competency hearing was whether Stanford could adequately assist his attorneys in the preparation of his defense.

## III. BUTNER'S MEDICAL EVALUATION

Butner conducted a lengthy and comprehensive competency evaluation, which included extensive treatment for the medical conditions that provided the basis for Stanford's initial commitment to Butner. Over the span of eight months, three different doctors at Butner—a psychologist, psychi-

---

**2.** Citation references beginning with "Transcript of Hearing" refer to the transcript of the competency hearing held from December 20 through 22, 2011. Cites identified by "Vol. 1" refer to testimony given on December 20, cites identified by "Vol. 2" refer to testimony given on December 21, and cites identified by "Vol. 3" refer to testimony given on December 22. *See* Transcript of Hearing Vol. 1, *United States v. Stanford*, No. 09–342 (S.D.Tex. Dec. 20, 2011), ECF 834; Transcript of Hearing Vol. 2, *United States v. Stanford*, No. 09–342 (S.D.Tex. Dec. 21, 2011), ECF 835; Transcript of Hearing Vol. 3, *United States v. Stanford*, No. 09–342 (S.D.Tex. Dec. 22, 2011), ECF 836.

**3.** Dr. Ralph B. Lilly—a defense-retained neurologist—performed an evaluation on Stanford and submitted a report containing his findings on December 11, 2011. Only Dr. A. David Axelrad—a defense-retained forensic and neuro psychiatrist—found impairment with respect to Stanford's ability to understand the proceedings, but he characterized those impairments as "mild" or "moderate." *See* Evaluation Report by Axelrad at 75–76 (Assessments Nos. 2–9).

atrist, and neuropsychologist—conducted numerous clinical interviews, physical examinations, and neuropsychological tests. Throughout the evaluation period, Dr. Robert Cochrane, Jr., Stanford's primary evaluator at Butner, conducted weekly formal interviews with Stanford, lasting between sixty and ninety minutes each, and made informal observations of Stanford on most weekdays.[4] *See* Transcript of Hearing Vol. 1 at 13–14. Butner's medical team consulted with outside specialists, including a neurologist, cardiologist, and gastroenterologist, each of whom reviewed Stanford's medical records and prior forensic psychiatric evaluations, as well as other relevant materials, including Stanford's e-mails, postal correspondence, phone recordings, and court transcripts. Butner's medical team also conducted phone interviews with the treating psychologist at the Federal Detention Center in Houston, as well as with various members of Stanford's family and two of Stanford's prior attorneys. *See* Butner Forensic Evaluation at 2–4, *United States v. Stanford*, No. 09–342 (S.D.Tex. Nov. 4, 2011), ECF No. 517 (listing Stanford's contact with medical professionals and other collateral information Dr. Cochrane reviewed).

## IV. DETAILED FINDINGS SUPPORTING THE COURT'S ORDER OF COMPETENCY

■ After reviewing all of the medical evaluations submitted by both sides at the December 2011 hearing, weighing the credibility and reliability of the experts' conclusions based on the methodologies used, thoroughness of evaluations, and considering all testimony and arguments, the Court details the following findings.

### A. Butner Effectively Withdrew Stanford From the Benzodiazepines

In January 2011, Stanford was found to lack the mental capacity to effectively assist his attorneys based on his reduced cognitive functioning. Three psychiatrists testified during the January 6, 2011 hearing, and all agreed that in order to better assess the cause of Stanford's impaired mental capacity, he should be withdrawn from certain prescription medication treatments he was receiving for anxiety and depression, specifically, Clonazepam (Klonopin®), Mirtazapine (Remeron®), and Sertraline (Zoloft®). *See* Order for Psychiatric Evaluation at 4–5. Over the course of the eight-month-evaluation period at Butner, Stanford was gradually withdrawn from these medications. *See* Butner Forensic Evaluation at 8–21. Thus, the primary medical concern identified at the January 2011 competency hearing (*i.e.*, the dosing levels of medication being administered to Stanford in response to his repeated demands for anti-anxiety medication) was addressed and resolved during Stanford's evaluation and treatment at Butner.

### B. Stanford's Cognitive Ability Allows Him to Assist His Counsel

The Court agrees with Butner's assessment that since, being withdrawn from anxiety and depression medications, Stanford "does not suffer from a mental illness which would interfere with his ability to understand the nature and consequences

---

4. Dr. Cochrane serves as the Director of Psychology Training at Butner. He is Board Certified in Forensic Psychology and is a member of the American Board of Professional Psychology. He also serves as an adjunct professor at the University of North Carolina. Dr. Cochrane estimates that he has performed approximately 800 competency exams. He previously tracked the percentage of defendants he found competent versus incompetent, and it closely tracked the standard rates in the medical literature. Transcript of Hearing Vol. 1 at 11.

of the proceedings against him or to assist properly in his defense." Butner Forensic Evaluation at 35. Specifically, with regard to Stanford's ability to consult with and assist his counsel, the Court adopts Butner's determinations that Stanford (1) fully understands that his counsel represents him, (2) is able to understand and respond to his counsel's questions, (3) is able to follow counsel's instructions, and (4) is able to ask counsel appropriate questions. *Id.* at 33. These assessments are supported by observations of Stanford's cognitive functioning throughout his lengthy and extensive stay at Butner. The Court further finds Butner's determination that Stanford was capable of participating at trial, in terms of following the proceedings, maintaining his demeanor, and testifying, if necessary, was supported by Butner's extensive observations of Stanford's daily functioning, testing of Stanford's intelligence level and cognitive abilities administered by both Butner doctors and the defense-retained doctors, as well as the Court's own observations of Stanford during the December 2011 hearing and during trial.[5] *Id.*

During Dr. Cochrane's weekly interviews, Stanford "consistently provided relevant information" about specifics of his case, demonstrating that he did "not suffer from any condition that would impact his ability to recall and provide counsel relevant information." *Id.* at 34. Butner's doctors observed that during telephone calls between April and August 2011, Stanford spoke fluently, recalled past events, organized disparate information, and communicated coherently. *Id.* at 6. By late June and early July 2011, Stanford's speech and thought processes were "orga-nized and goal-directed" with "no evidence of cognitive slowing." *Id.* at 9. In late July 2011, even after having ceased a physical-exercise regimen that had previously helped him regain vitality, Stanford was "alert, lucid, and oriented." *Id.* at 11. Similarly, in September 2011, despite feeling fatigue, Stanford was alert and attentive, and he did not exhibit any difficulty discussing recent world news. *Id.* at 18.

These observations, having occurred over a number of months, are consistent with the results of neuropsychological testing administered by Butner's medical team regarding Stanford's cognitive ability. Despite the fact that the neuropsychological tests likely underestimated Stanford's cognition due to his malingering (discussed further *infra*), Stanford nevertheless performed in the average or above-average range in terms of reading ability, nonverbal abstract reasoning, basic sequencing speed, visuospatial or constructional skills, nonverbal learning, and unstructured verbal learning and memory. *Id.* at 25.

The cognitive testing administered by defense-retained doctors also shows average to above-average functioning, which is inconsistent with the very low level of cognitive functioning that characterizes incompetency. *See* Victor R. Scarano, M.D., J.D., Forensic Psychiatric Examination/Evaluation at 18–20 (December 12, 2011) (hereinafter, "Scarano Report") (stating conclusions of "above average" on fund of information; "just above average" on attention/digit span; "above average on concentration"; "below average" in memory; "superior" in judgment comprehension; "average" in abstract reasoning; 28 out of 30 correct on the mini-mental exam;

---

**5.** Butner's doctors cautioned that Stanford's insomnia and fatigue could pose problems during court proceedings if they worsen. However, the doctors did not identify any reason to believe such conditions would worsen, and they did not opine that the worsen-ing of Stanford's insomnia and fatigue would render him incompetent. As discussed *infra*, Stanford was fully alert during trial. On the few days when Stanford experienced cold or flu-like symptoms, the Court adjourned trial early to accommodate Stanford's condition.

above-average time and no errors on the Trails–B sequencing test); *see also* Larry Pollock, Ph.D., Neuropsychological Evaluation at 9 (December 8, 2011) (hereinafter, "Pollock Report") (concluding that Stanford's intellectual abilities and academic functioning are "average"); Transcript of Hearing Vol. 1 at 277 (Dr. Pollock discussing these findings). The Court concludes that the defense-retained doctors did not persuasively reconcile these assessments of Stanford's cognitive abilities with their opinions that Stanford is incompetent. Therefore, the Court concludes that Stanford's cognitive abilities are not significantly impaired and are certainly not at the low level of functioning typical of incompetent parties. *See, e.g., United States v. Joseph*, 333 F.3d 587, 589 (5th Cir.2003) (defendant competent where he possessed "a lot of his faculties"); *United States v. Morrison*, 153 F.3d 34, 39–40 (2d Cir.1998) (defendant could assist counsel despite paranoid delusions); *United States v. Swanson*, 572 F.2d 523, 527 (5th Cir.1978) (defendant could assist counsel despite having amnesia); Transcript of Hearing Vol. 1 at 57 (Dr. Cochrane testifying that the medical literature recognizes that even 70% of patients with mild retardation are competent to stand trial).

## C. Reliable Evidence, Including Scientifically Valid Neuropsychological Testing, Demonstrates that Stanford Is Feigning Retrograde Amnesia

While Butner's medical team successfully withdrew Stanford from the anxiety and depression medications, Stanford began claiming a new condition *i.e.*, complete memory loss of all events prior to a September 2009 jail assault in which Stanford sustained a head injury. In June 2011,

Stanford began making repeated claims of having no independent recollection of personal life events or business dealings that predated the head injury. In consequence, Butner's evaluation and treatment began to focus on Stanford's new claim of complete retrograde amnesia.[6] Butner Forensic Evaluation at 13.

In evaluating whether the credible medical evidence supports Stanford's claim of amnesia, it is important to emphasize the severity of Stanford's claimed memory loss. Stanford repeatedly claimed to Butner's medical doctors that he was "completely amnestic to his life prior to the assault, stating that 59 years were stolen." Butner Forensic Evaluation at 22; *id.* at 7 ("He stated that he has no independent recollections of personal life events or business dealings prior to the assault in September 2009.... He characterized having all of his memories 'erased' by the assault."); *id.* at 13 ("Mr. Stanford continued to assert he was amnestic for all of his past life events, including his romantic encounters with various female partners, past vacation and holiday activities with his children, visits with famous politicians, as well as details of his business and banking operations."); *see also* Transcript of Hearing Vol. 1 at 21 (Dr. Cochrane describing Stanford's claims that "there was nothing he could independently recall prior to the [head] injury"); *id.* at 23 (Dr. Cochrane relaying Stanford's claim that "the government had erased his whole memory"). As a further example, Stanford claimed that family members have had to educate him about his personal and family history, and that he "indicated feeling bad after being informed by his family that he was known as a 'womanizer.'" Butner Fo-

---

**6.** Retrograde amnesia is an inability to recall memories occurring prior to an injury. By comparison, anterograde amnesia is an inability to recall memories occurring after an injury. In legal terms, retrograde amnesia is loss of "long term" memory, whereas anterograde amnesia is loss of "short term" memory.

rensic Evaluation at 8. While defense-retained doctors did not identify clearly the extent of Stanford's claimed memory loss in their reports, *see, e.g.*, Scarano Report at 26 (referring generally to "memory deficits"), they testified on cross examination that Stanford had reported to them the same extent of memory loss that he had claimed while at Butner. *See* Transcript of Hearing Vol. 1 at 243 (Dr. Pollock); Transcript of Hearing Vol. 2 at 145 (Dr. Scarano).

Because Stanford's assertions of memory loss presented an "extremely unusual and rare pattern of amnesia," proper diagnosis of Stanford's claims became a "major focus of the ongoing assessment" that Butner performed. Butner Forensic Evaluation at 13; *see also* Transcript of Hearing Vol. 1 at 22 (Dr. Cochrane testifying that retrograde amnesia "happens so infrequently that it is hardly documented in the scientific literature."). Such an inquiry is necessary because medical research indicates that an "estimated 40% of individuals suffering from mild head injury and involved in litigation will malinger cognitive deficits during neuropsychological assessment." Tracey O'Connor–Pennuto, J.D., Ph.D., Neuropsychological Evaluation at 1 (December 16, 2011) (hereinafter, "Pennuto Report"). As described in detail below, Stanford's neurological and neuropsychological examinations and test results and a comparison of Stanford's claims of amnesia against inconsistent collateral evidence, viewed together with the late onset of Stanford's supposed memory impairment and the lack of verifiable cases in the medical literature remotely similar to his claim, in totality support a finding that Stanford's claimed retrograde amnesia is not credible.

### 1. Stanford's Claims of Memory Loss Are Not Credible Given His Inconsistent Claims and Collateral Information

Butner concluded that Stanford's complaints of memory loss were "not credible" based on a number of indicators, including the fact that, following the September 2009 assault, Stanford had "no difficulty spontaneously recalling personal and business information." Butner Forensic Evaluation at 26. Notably, just three weeks after the assault, Dr. Scarano evaluated Stanford during which Stanford recalled "significant details from recent and remote life events." *Id.* at 4–5; Transcript of Hearing Vol. 2 at 156–58; *see also generally* Victor R. Scarano, M.D., J.D., Forensic Psychiatric Examination/Evaluation (November 2, 2009), ECF No. 173. Indeed, none of the multiple reports and letters Dr. Scarano drafted based on his assessments of Stanford after the September 2009 assault, but prior to Stanford's commitment to Butner, mentioned Stanford claiming any degree of retrograde amnesia. Transcript of Hearing Vol. 2 at 158–64 (acknowledging no mention of retrograde amnesia in a November 2009 report, three April 2010 reports, or a December 2010 report). Dr. Daniel Fox, a psychologist at the Federal Detention Center in Houston, Texas, likewise confirmed that Stanford did not show any memory problems between September 2009 and his commitment to Butner in February 2011. Butner Forensic Evaluation at 5.

Furthermore, Stanford's e-mails and phone calls, written and made after September 2009, demonstrate his ability to recall specific events that predated the assault and therefore belie his claims that he could only recall information that had been conveyed to him while in custody. *Id.* at 27.[7] So does the transcript of a May

---

7. The Butner Forensic Evaluation cites an e-mail from December 2010 in which Stanford recounts past experiences with his then-fian- ce, Andrea Stoelker, and e-mails in which he refers to historical figures like Mother Theresa. Butner Forensic Evaluation at 20–21. In

2010 motion hearing in a related civil insurance coverage case, assigned to United States District Judge Nancy Atlas in Houston, wherein Stanford represented himself, spoke cogently and with significant recall of events in arguing his position. *See* Transcript of Motion Hearing at 29–35, *Holt v. Underwriters,* No. H–09–3712 (S.D.Tex. May 25, 2010), ECF No. 119.[8] Moreover, at the January 2011 competency hearing, none of the testifying doctors opined that Stanford was suffering from extensive retrograde amnesia, which Stanford later began to complain about during his stay at Butner. Similarly, neither Stanford's e-mails nor his medical records demonstrate that he was claiming retrograde amnesia at the time he arrived at Butner.

### 2. Butner's Neuropsychological Testing Strongly Evidences Malingering

Butner concluded that neuropsychological testing would provide the most effective, available measurement of memory assessment.[9] Butner Forensic Evaluation at 14. Accordingly, a Butner neuropsychologist, Tracey O'Connor–Pennuto, J.D., Ph. D., held five sessions of neuropsychological evaluation and administered sixteen different tests, some of which she administered multiple times. At the beginning of these sessions, Stanford reiterated that he had absolutely no independent memory of events predating the assault. Dr. Pennuto

evaluated Stanford by administering several widely accepted and validated neuropsychological tests used to detect malingering. On the Green Word Memory Test, a validity test to detect response bias and effort, **Stanford's scores were worse than subjects with "severe cognitive impairment, such as elderly hospitalized patients with advanced dementia, those with moderate to severe brain injuries, as well as mentally retarded adults and children."** *Id.* at 23 (emphasis added). Dr. Pennuto concluded that Stanford's performance indicated that he was "blatantly simulating cognitive defects/known to be malingering." *Id.*

Stanford's performance on the Test of Memory Malingering ("TOMM") likewise fell **"well below scores typically obtained by patients with notable cognitive defects, including traumatic brain injury, mental retardation, and dementia."** *Id.* at 24 (emphasis added); *see also* Transcript of Hearing Vol. 1 at 34–35 (Dr. Cochrane explaining the test). Stanford's performance was approximately two standard deviations below the mean. Transcript of Hearing Vol. 1 a 35. Stanford's performance on the California Verbal Learning Test–II test was not only below 100% of the normative sample for Stanford's age **"but also below even those with advanced dementia."** Butner Forensic Evaluation at 24 (emphasis added). Stanford's scores on the Wechsler Memory

addition, in a December 2010 e-mail, Stanford recounts his prior interactions with, and his impressions of, current Speaker of the House John Boehner. Transcript of Hearing Vol. 1 at 244–45 (Stanford e-mail to Carin and Kathy Stoelker, dated December 3, 2010, discussing political events).

8. The Fifth Circuit has recognized the importance of comparing claims of impairment against collateral information. *See United States v. Williams,* 998 F.2d 258, 266 & n. 20 (5th Cir.1993) (upholding the district court's

finding that there was no need for a competency examination in light of collateral information that the defendant had been representing himself in a custody case involving his son and had written coherent correspondence during the time period in question).

9. The three psychiatrists whose evaluations served as the basis for the Court's January 2011 Order finding Stanford incompetent each recommended neuropsychological examinations to assess Stanford's competency. Order for Psychiatric Evaluation at 5.

Scale–IV and Wechsler Adult Intelligence Scale–IV Reliable Digit Span tests were **also sufficiently low as to evidence that he was either "not motivated to perform well or purposely exaggerate[ing] cognitive deficits."** *Id.* (emphasis added).

The defense-retained experts did not challenge the validity or reliability of the neuropsychological tests that Dr. Pennuto administered. Nor did they dispute that Stanford's results on those tests were well below what would normally be expected of someone putting forth genuine effort, even if the person manifested the impairments of which Stanford complained. *See* Transcript of Hearing Vol. 1 at 267 (Dr. Pollock agreeing that Stanford "was clearly not putting forth effort" on the memory tests administered at Burner).

Instead, Dr. Scarano, Dr. Pollock, and Dr. Axelrad all excused Stanford's low scores with the claim that Stanford was depressed and sleep deprived.[10] *See, e.g.,* A. David Axelrad, M.D., Evaluation Report at 46 (December 12, 2011) (hereinafter, "Axelrad Report"). These doctors, however, were not present to witness Stanford's condition during the Burner testing, whereas Dr. Pennuto was present and determined that his condition was suitable for testing. Pennuto Report at 3. Indeed, the fact that Butner's "testing was delayed for over 7 months in order to assure he was cognitively cleared for testing," *id.,* demonstrates that Butner's medical doctors were attuned to the issue of ensuring that Stanford's medical condition allowed

for valid test results. Moreover, the fact that Dr. Pennuto's finding of malingering was based on neuropsychological tests conducted over multiple days weighs against the rationalization for depression and fatigue as an explanation for Stanford's low scores. And both Dr. Pollock and Dr. Scarano performed testing of Stanford during December 2011, which indicates that they did not view any fatigue or depression at that time as presenting impediments to valid testing.

Significantly, neither Dr. Axelrad nor Dr. Pollock provided any explanation as to why, even assuming depression and fatigue, Stanford's performance would be worse than subjects with advanced dementia or mental retardation. As Dr. Pennuto persuasively explained in responding to the purported "fatigue" and "depression" explanation for Stanford's low scores:

> I should note that in my experience at VAs and multiple medical centers, I have administered comprehensive neuropsychological test batteries to patients referred from chronic pain clinics, patients who have suffered severe head trauma, patients with poor sleep, patients with chronic fatigue syndromes, patients with PTSD, patients on multiple medications that may impact cognitive functioning, and patients with advanced dementia, among others. *These patient populations are able to pass effort tests.* The idea of effort tests is that they appear complex, but are actually quite simple, so that factors such as fatigue,

10. Dr. Axelrad's initial prehearing written report also claimed that Stanford was under the influence of benzodiazepines during the neuropsychological testing, which Dr. Pennuto administered. Axelrad Report at 44. During the December 2011 competency hearing, however, Dr. Axelrad acknowledged that this statement was erroneous. Transcript of Hearing Vol. 3 at 93–95 (Dr. Axelrad acknowledging the fact Stanford had not taken any benzodiazepines on the day of Pennuto's testing or during the previous six days, and Dr. Axelrad further acknowledging that he "should have made a different statement" in his report). Another defense-retained doctor also acknowledged that considering the half life of the Lorazepam that Stanford had last taken more than five days prior to the commencement of Dr. Pennuto's testing, the medication would not have remained in Stanford's system. Transcript of Hearing Vol. 2 at 194.

pain, irritation, depression, and anxiety do not affect them. Please note that these factors can affect cognitive functioning on traditional neuropsychological tests, and such impact must be considered in the interpretation of such measures. . . . *However, we would not expect clear and convincing failure on every effort test due to these factors.* . . . Of particular importance, Mr. Stanford profoundly failed Green's Word Memory Test. Again, as noted above, the Word Memory Test is validated across many populations, including those with dementia, major depression, moderate-to-severe brain injury, chronic pain syndromes, and mentally retarded children. Mr. Stanford performed so poorly, there is simply no explanation other than feigning of cognitive symptoms. That is, he performed far below elderly hospitalized patients with advanced dementia who are unable to care for their own needs. He performed far below mentally retarded children and those with sever psychopathology. He performed far below those suffering from moderate-to-severe brain injury with a GCS mean of 9.0. Symptoms of fatigue, pain and anxiety simply cannot explain Mr. Stanford's performances.

Pennuto Report at 4 (italics in original). The Court finds the conclusions of Dr. Pennuto—an experienced neuropsychologist who was present when these tests were administered—are credible, supported by the medical literature, and consistent with other evidence of malingering.

While the defense retained four different doctors, none of them were able to counter Butner's extensive findings with any valid neuropsychological malingering tests in which Stanford showed reasonable effort. Moreover, none of them conducted a full battery of malingering tests administered over multiple days that comes close to being as comprehensive as the tests Dr. Pennuto administered. In particular, nei-

ther Dr. Axelrad nor Dr. Lilly administered any malingering tests. Transcript of Hearing Vol. 2 at 77 (Dr. Lilly acknowledging he did not perform neuropsychological testing). The only malingering measure Dr. Scarano administered was the Rey 15 Item test. Transcript of Hearing Vol. 2 at 195. But as Dr. Scarano himself admitted, the medical literature considers the Rey 15 Item test merely a screening instrument as it has low sensitivity for detecting malingering. Transcript of Hearing Vol. 2 at 196. (Dr. Scarano stating "of course" in response to being asked whether he agreed that the Rey 15 Item test is not "going to capture all malingering"); *see also* Transcript of Hearing Vol. 1 at 42–43 (Dr. Cochrane explaining that the Rey 15 Item test is "not a full fledged malingering test"); Pennuto Report at 2 (same). Dr. Pollock, the defense-retained neuropsychologist, performed only the Rey 15 Item test and the TOMM, and Dr. Pollock also recognized that the Rey 15 has low sensitivity for detecting malingering, Transcript of Hearing Vol. at 252–57, which left the TOMM as the only test recognized as a valid detector of malingering and that any of the defense-retained doctors administered.

The concern with Dr. Pollock's administration of the TOMM, however, is that Stanford had already failed the TOMM previously administered by Butner, the results of which were documented in Burner's Forensic Evaluation and made available to, and discussed with, Stanford prior to his testing session with Dr. Pollock. *See* Transcript of Hearing Vol. 1 at 43–44. Dr. Pennuto explained in her report that re-administering the same test after a patient is informed that prior test results demonstrated a lack of effort is not likely to "actually assess Mr. Stanford's effort." Pennuto Report at 2; *see also* Transcript of Hearing Vol. 1 at 275 (Dr. Pollock agreeing with Dr. Pennuto's

conclusion).[11] While the Court has considered all tests—those administered by Burner and defense-retained doctors—the Court nevertheless finds that the specific tests administered at Butner, and the testing conditions of those tests, provide a more reliable basis for determining whether Stanford was malingering. Consequently, the Court finds that the quantity and degree of the Butner malingering tests, in addition Stanford's consistently low scores, presents compelling, objective evidence that Stanford was malingering.

### 3. Neurological Testing Showed No Basis for Memory Loss

In addition to the compelling evidence of Stanford's malingering, the results of the neurological tests administered at Butner are *inconsistent* with Stanford's claim of retrograde amnesia. On March 9, 2011, Stanford underwent a Magnetic Resonance Imaging ("MRI") procedure, and a neurologist retained by Butner assessed the results. The neurologist found no evidence of damage to any part of Stanford's brain that processes memory. Butner Forensic Evaluation at 19. Moreover, in examining Stanford and reviewing his available medical history, the neurologist observed inconsistencies in Stanford's responses, which were further indicative of malingering. *See id.* (noting the neurologist's finding that Stanford's reported memory deficits were "grossly out of proportion to expected memory loss" from a head trauma.). Specifically, on a Sharp/Dull test the neurologist administered in which a patient closes his eyes and is poked with an object and asked if he was touched with the sharp or dull part of the object, Stanford's responses were inconsistent and were sig-

nificantly delayed whereas even a patient with brain injuries can respond quickly. Transcript of Hearing Vol. 1 at 32–33 (explaining sharp/dull test and Stanford's responses, which supported the finding of malingering). The neurologist retained by the defense, Dr. Lilly, did not administer a Sharp/Dull test or visual field exam, both of which assist in determining whether claimed defects are consistent with organic brain damage, and both of which were administered by the Butner-retained neurologist. Transcript of Hearing Vol. 2 at 73–74. Moreover, while Dr. Lilly disagreed with the neurologist Butner retained about whether certain punctate spots visible on Stanford's MRI were related to aging or organic brain disorders, Dr. Lilly did not review the actual MRI. Transcript of Hearing Vol. 2 at 68. Therefore, the Court finds that, based on the neurological testing performed by Butner's retained neurologist, and the lack of support for Dr. Lilly's disagreements, Stanford's claim of complete memory loss lacks merit.

### 4. There Is No Credible Medical Evidence That Supports Stanford's Claims of Memory Loss

Both the Butner doctors and defense-retained doctors agree that the type of amnesia claimed by Stanford in which one loses almost complete memory of events prior to an injury or onset of disease is a "rare phenomenon." Butner Forensic Evaluation at 27; *see also* Transcript of Hearing Vol. 2 at 61 (testimony of Dr. Lilly); Transcript of Hearing Vol. 2 at 144 (Dr. Scarano describing global retrograde amnesia as "very rare"). In fact, no credible medical evidence was presented at the

11. Dr. Pollock argued that Butner's TOMM results should not have been shown to, or discussed with, Stanford. Placing that issue aside—even though it is generally expected in competency proceedings that an attorney will review the medical reports submitted to the court with his or her client—Dr. Pollock agreed that it would not make sense to administer the same test a patient recognized as one on which he or she had recently received scores showing lack of effort.

hearing showing complete amnesia can result from a single head injury like that which Stanford sustained. Butner Forensic Evaluation at 27. Thus, Stanford's professed inability to recall salient childhood events is "extremely unusual." *Id.* at 9.

Stanford argued that his dosage of benzodiazepines may be a cause for his claimed memory loss. But while the medications Stanford received are known to have possible adverse effects on anterograde memory, there is no credible evidence that these medications "could account for the extensive retrograde amnesia as reported by Mr. Stanford." Butner Forensic Evaluation at 9, 27; Transcript of Hearing Vol. 1 at 168–69 (Dr. Cochrane explaining that medical literature recognizes only anterograde memory loss, which Stanford did not claim, as a possible side effect of benzodiazepines); Transcript of Hearing Vol. 2 at 67 (Dr. Lilly acknowledging that he is not aware of any medical literature recognizing that benzodiazepine use causes retrograde amnesia); Transcript of Hearing Vol. 2 at 160 (Dr. Scarano admitting that there is no medical literature documenting benzodiazepine use causing retrograde amnesia).

The supposed late onset of Stanford's retrograde amnesia, which, according to Stanford, did not manifest significant symptoms until more than eighteen months after the September 2009 assault, casts further doubt that such a single-head injury caused such substantial memory loss. *See* Butner Forensic Evaluation at 26. None of the defense-retained doctors identify a single verifiable case documented in reliable medical literature in which a single head injury had caused complete retrograde amnesia with onset not occur-ring until eighteen months after the incident. *See* Transcript of Hearing Vol. 2 at 66 (testimony of Dr. Lilly acknowledging that he has not provided "any credible medical evidence for retrograde amnesia with a delayed onset of months"); Transcript of Hearing Vol. 2 at 160 (testimony of Dr. Scarano acknowledging that late onset of retrograde amnesia "would be unusual" and is not supported by the medical literature). Aside from the lack of a documented example in the literature, none of the defense-retained doctors provided a rational, medical explanation of how Stanford's complete retrograde amnesia could result from a single head injury.[12] In fact, during the December 2011 competency hearing, Dr. Scarano characterized Stanford's claim of complete retrograde amnesia as an "embellishment," essentially conceding that Stanford was malingering with respect to such claims. Transcript of Hearing Vol. 2 at 145.

The Court, therefore, finds that overwhelming evidence, including objective, medically valid neuropsychological and neurological testing, supports the finding that Stanford was malingering with respect to his claim of retrograde amnesia. In addition to rejecting Stanford's claim of retrograde amnesia, the Court's finding of malingering has two other ramifications. First, the **ability** to malinger is itself evidence of competence as Stanford had the cognitive ability to present, over a number of months, consistent claims of retrograde amnesia that seemed convincing to both the Butner and defense-retained doctors when evaluated solely in terms of Stanford's presentation. Transcript of Hearing Vol. 1 at 24 (Dr. Cochrane testifying that Stanford's presentation of the retrograde amnesia was convincing). As Dr. Pennuto

---

12. While Dr. Lilly contended that amnesia resulting from head trauma may be progressive, he acknowledged that the authoritative Diagnostic and Statistical Manual of Disorders states that "[d]ementia due to head trauma is usually non-progressive." Transcript of Hearing Vol. 2 at 52.

noted, "such convincing deception necessitates intact cognitive functioning." Pennuto Report at 4. Second, Stanford's ability to present such claims of memory loss undermines reliance on Stanford's self-reporting of other symptoms—and the defense-retained doctors rely heavily on Stanford's self-reporting in reaching their conclusions. *See generally* Scarano Report (citing Stanford's self-reporting on over 70% of the Report's pages); Transcript of Hearing Vol. 2 at 146–48 (Dr. Scarano); Transcript of Hearing Vol. 3 at 107–08 (Dr. Axelrad). Therefore, conclusions presented, which rely on Stanford's self-reporting of symptoms, are necessarily questionable.

## V. ADDITIONAL FACTORS SUPPORTING THE VALIDITY OF BUTNER'S CONCLUSION

Courts have recognized that sustained evaluations in a Bureau of Prisons medical facility "provide the Court with a more complete picture of the defendant's mental competency" and "staff at these institutions are familiar with the *Dusky* standard of mental competence." *United States v. Weston*, 36 F.Supp.2d 7, 13–14 & n. 11 (D.D.C.1999) (citing *Featherston v. Mitchell*, 418 F.2d 582, 586 (5th Cir.1969)). Indeed, Butner's forensic evaluation was significantly more comprehensive than previous evaluations on which the Court based its initial finding of incompetency and more comprehensive than post-Butner evaluations performed by defense-retained doctors. While the defense-retained doctors observed Stanford for only hours, or at best a few days,[13] Butner's doctors observed him intensively for eight months, which allowed not just for formal assessments but also repeated observations of Stanford's day-to-day functioning. The defense-retained doctors conceded that all other things being equal, a lengthier period of evaluation produces more reliable assessment of competency. *See* Transcript of Hearing Vol. 1 at 238 (Dr. Pollock); Transcript of Hearing Vol. 2 at 90 (Dr. Lilly).

The Court also finds that Butner's medical staff was objective and unbiased. They sought collateral information from both parties. Transcript of Hearing Vol. 1 at 64; *see also generally* Butner Forensic Evaluation. The fact that Butner did not return Stanford after the initial four month assessment, but instead sought permission to evaluate Stanford for an additional four months, rebuts the defense argument that Butner had an incentive simply to return Stanford to Houston for trial. Transcript of Hearing Vol. 1 at 62–63, 66.

The Court finds that the number of doctors involved in the Butner examination, the qualifications and experience of those doctors, and the length and comprehensiveness of Butner's forensic evaluation support the credibility of Dr. Cochrane's ultimate finding of competence. Moreover, while the defense-retained doctors testified that Stanford is not competent, the Court is not persuaded by their underlying findings of Stanford's cognitive ability, and therefore, the Court does not find their conclusions to be demonstrative of the type of severe impairment consistent to undermine the low threshold for competence.

---

13. Three of the defense-retained doctors who filed reports interacted with Stanford on just a single day following his return from Butner. *See* Axelrad Report at 9 (Dec. 10 visit); Lilly Report at 3 (Dec. 9 visit); Pollock Report at 1 (Dec. 8 visit). Dr. Scarano interacted with Stanford on just two occasions following his return from Butner. *See* Scarano Report at 2, 8 (Nov. 17 visit & Dec. 7 visit). By contrast, Butner's medical doctors continually evaluated Stanford for eight months.

## VI. OBSERVATIONS OF STANFORD DURING SEVEN–WEEK JURY TRIAL

Stanford's conduct during the seven-week trial that began January 23, 2012 lends additional support to the Court's December 22, 2011 Order finding Stanford competent to stand trial. Throughout the trial, and during breaks, Stanford was attentive and fully engaged with his counsel in the courtroom, as well as with a consulting expert who sat at defense counsels' table. The Court observed Stanford repeatedly writing notes and reviewing exhibits with his counsel and the consulting expert. These observations lend support to the Court's ultimate conclusion that Stanford was competent to stand trial. *See, e.g., Drope v. Missouri,* 420 U.S. 162, 180, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975) ("[E]vidence of a defendant's irrational behavior, *his demeanor at trial,* and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient." (emphasis added)); *United States v. Copson,* 129 F.3d 606 (table), No. 96-50734, 1997 WL 680371, at *1 (5th Cir. Sept. 17, 1997) (affirming district court's determination that the defendant was sufficiently competent to understand the sentencing proceedings where district court based its determination on evidence of the defendant's mental state and its own observations of the defendant); *United States v. Nichols,* 56 F.3d 403, 411 (2d Cir.1995) ("In making a determination of competency, the district court may rely on a number of factors, including medical opinion and the court's observation of the defendant's comportment."); *United States v. Kirsh,* 54 F.3d 1062, 1070 (2d Cir.1995) ("[T]he district court's view of the defendant's competency based on its observations at trial is entitled to deference.").

## VII. CONCLUSION

Based on all of the foregoing, the Court hereby finds that Stanford has a sufficient present ability to consult with his defense counsel with a reasonable degree of rational understanding and that he has a rational, as well as factual, understanding of the proceedings against him, thereby making him competent to stand trial. The detailed findings outlined in this Memorandum Opinion, together with an overall assessment of the evidence and arguments presented at the December 2011 competency hearing, support the Court's initial December 22, 2011 Order of Competency.

**IT IS SO ORDERED.**